UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANWAR SHAKIR, SR., | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:11-CV-1940 (JCH) |
| | : | |
| v. | : | |
| | : | |
| DERBY POLICE DEPARTMENT, ET AL., | : | JANUARY 5, 2018 |
| Defendants. | : | |

**<u>RULING ON DEFENDANTS FRATTA AND MAROTTA'S MOTION FOR SUMMARY
JUDGMENT (DOC. NO. 198) AND DEFENDANT STANKYE'S MOTION FOR
SUMMARY JUDGMENT (DOC. NO. 201)</u>**

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 2

II.  PROCEDURAL BACKGROUND .......................................................................... 2

III. STANDARD OF REVIEW ...................................................................................... 4

IV.  FACTS ...................................................................................................................... 5

V.   DISCUSSION ........................................................................................................ 15

   A.   Personal Involvement (Marotta) ........................................................... 16

   B.   Procedural Due Process (Fratta and Stankye) ................................. 23

      1.   Applicable Law .............................................................................. 24

      2.   Removal of A.S. from Shakir's Home ......................................... 27

      3.   Interview of A.S. at Derby Police Department ........................... 32

      4.   Release of A.S. to Gandy ............................................................. 35

      5.   Conspiracy ..................................................................................... 39

   C.   Substantive Due Process (Fratta and Stankye) ............................... 45

   D.   Fourth Amendment Unlawful Seizure (Stankye) .............................. 46

   E.   Fourth Amendment Unlawful Search (Stankye) ............................... 48

   F.   Eighth Amendment Conditions of Confinement (Stankye) ............. 57

   G.   Declaratory Relief (Stankye) ................................................................ 68

VI.  CONCLUSION ...................................................................................................... 72

## I.    INTRODUCTION

The plaintiff, Anwar Shakir, Sr., ("Shakir"), is currently incarcerated at Corrigan-Radgowski Correctional Institution, in Uncasville, Connecticut.  He brings this civil rights action pro se pursuant to section 1915 of title 28 of the United States Code against Derby Police Detective Charles Stankye, Department of Children and Families ("DCF") Supervisor Kathie Marotta, and DCF Social Worker Michele Fratta.  See Amended Complaint ("Am. Compl.") (Doc. No. 106).

Before the court is a Motion for Summary Judgment filed by Fratta and Marotta and a Motion for Summary Judgment filed by Stankye.  See Fratta and Marotta Motion for Summary Judgment ("Fratta MFSJ") (Doc. No. 198); Stankye Motion for Summary Judgment ("Stankye MFSJ") (Doc. No. 201).  For the reasons below, Fratta and Marotta's Motion is granted, and Stankye's Motion is granted in part and denied in part.

## II.    PROCEDURAL BACKGROUND

On December 15, 2011, Shakir filed a Complaint against Stankye, Marotta, Fratta, the Derby Police Department, and Assistant State's Attorney Charles Stango.  See Complaint ("Compl.") (Doc. No. 1).  On March 31, 2015, the court granted a Motion to Dismiss all claims against Stango.  See Ruling Granting Stango's Motion to Dismiss (Doc. No. 101).  On April 27, 2015, Shakir filed an Amended Complaint naming only Stankye, Marotta, and Fratta as defendants.  See Am. Compl.  The court then denied Shakir's Motion for Leave to File a Second Amended Complaint to clarify some of the allegations in his first Amended Complaint and to add additional claims.  See Ruling (Doc. No. 175).  Thus, the first Amended Complaint remains the operative complaint.

On March 31, 2016, the court granted in part and denied in part a Motion to Dismiss filed by Stankye and a separate Motion to Dismiss filed by Fratta and Marotta.

See Ruling on Stankye's Motion to Dismiss ("Ruling on Stankye MTD") (Doc. No. 176); Ruling on Fratta and Marotta's Motion to Dismiss ("Ruling on Fratta MTD") (Doc. No. 177). Following these Rulings, Shakir's federal conspiracy claim, his Fourth Amendment search and seizure claims, his Fourteenth Amendment substantive and procedural due process claims, and his Eighth Amendment conditions of confinement claim remain pending against Stankye in his individual capacity, and Shakir's claim for declaratory relief remains pending against Stankye in his official capacity. See Ruling on Stankye MTD. Against Fratta and Marotta, the claims that remain pending are Shakir's Fourteenth Amendment procedural and substantive due process claims and his federal conspiracy claim. See Ruling on Fratta MTD.

On September 26, 2016, Stankye filed a Motion for Summary Judgment, and Fratta and Marotta filed a separate Motion for Summary Judgment. See Stankye MFSJ; Fratta MFSJ. The court addresses both Motions together in this Ruling.

On May 5, 2017, the court appointed pro bono counsel for Shakir. See Order Appointing Pro Bono Counsel (Doc. No. 303). The court granted Shakir's Oral Motion to Reopen Discovery (Doc. No. 314) to give counsel an opportunity to conduct and file supplemental briefs on behalf of Shakir. See Minute Entry (Doc. No. 315). After the reopened discovery period expired, Shakir filed a Declaration of additional evidence, but counsel did not file any supplemental briefings on his behalf. See Declaration by Plaintiff to Provide Court with Additional Evidence ("Pl.'s Suppl. Decl.") (Doc. No. 320). Having received no supplemental briefings, the court decides the Motions for Summary Judgment based on Shakir's initial pro se filings. See Order (Doc. No. 324).

## III.    STANDARD OF REVIEW

A motion for summary judgment may be granted only where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Redd v. N. Y. Div. of Parole, 678 F.3d 166, 173–74 (2d Cir. 2012). The moving party bears the burden of "showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation marks and citations omitted). "Once a party moving for summary judgment has made the requisite showing that there is no factual dispute, the nonmoving party bears the burden of presenting evidence to show that there is, indeed, a genuine issue for trial." Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). The nonmoving party cannot "rely on conclusory allegations or unsubstantiated speculation," but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

In reviewing the record, the court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc., 716 F.3d 302, 312 (2d Cir. 2013).

> The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists. . . . Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit, for the court in considering such a motion must disregard all evidence favorable to the moving party that the jury is not required to believe.

Rogoz v. City of Hartford, 796 F.3d 236, 245–46 (2d Cir. 2015) (internal quotation marks, citation, and emphasis omitted).

Where one party is proceeding pro se, the court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." Willey v. Kirkpatrick, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Despite this liberal interpretation, "unsupported allegations do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Additionally, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

## IV.    FACTS[1]

At all relevant times, Stankye was employed by the Derby Police Department,[2] and Fratta and Marotta were employed by DCF. See Stankye's Local Rule 56(a)1 Statement of Facts ("Stankye L.R. 56(a)1") (Doc. No. 201-2) at 1 ¶ 1; Fratta and Marotta's Local Rule 56(a)1 Statement of Facts ("Fratta L.R. 56(a)1") (Doc. No. 214-2).

---

[1] The relevant facts are taken from Stankye's Local Rule 56(a)1 Statement of Undisputed Facts ("Stankye L.R. 56(a)1") (Doc. No. 201-2) and its supporting exhibits (Doc. Nos. 201-4 to 201-11); Shakir's Local Rule 56(a)2 Statement of Facts in response to Stankye's MFSJ ("Pl.'s L.R. 56(a)2 to Stankye") (Doc. No. 215-2) and its supporting exhibits (Doc. Nos. 212, 213, 215-3, 216), Fratta and Marotta's Local Rule 56(a)1 Statement of Facts ("Fratta L.R. 56(a)1") (Doc. No. 196) and its supporting exhibits (Doc. Nos. 195-2 to 195-7), and Shakir's Local Rule 56(a)2 Statement of Facts in response to Fratta and Marotta's MFSJ ("Pl.'s L.R. 56(a)2 to Fratta") (Doc. No. 214-2) and its supporting exhibits (Doc. Nos. 212, 213, 214-3, 216). The court notes that, although Stankye titles his statement "Statement of Undisputed Facts," the facts are not undisputed. See Pl.'s L.R. 56(a)2 to Stankye.

[2] Although Shakir marks this fact as disputed in his L.R. 56(a)2 Statement of Facts, his full response does not actually dispute that Detective Stankye was employed by the Derby Police Department at all relevant times. See Pl.'s L.R. 56(a)2 to Stankye at 1 ¶ 1, 3 ¶ 1. Frequently, throughout both of Shakir's L.R. 56(a)2 Statements of Facts, he labels the fact as disputed without actually disputing the content of the underlying fact, but merely uses his Statement of Facts to attempt to advance his argument. Where the plaintiff's Statement of Facts does not dispute the actual content of the specific fact cited, the court references the plaintiff's Statement in its citation to note the absence of a dispute.

Shakir and Starquonda Gandy have one child together, Anwar Shakir, Jr. ("A.S."). See Stankye L.R. 56(a)1, Ex. B (Doc. No. 201-5) at 2; Fratta L.R. 56(a)1 at 2 ¶ 7. Gandy also has another child, Taeja Gandy ("T.G."), of whom Shakir is not the father. See id.

In 2008, Gandy left the home she shared with Shakir in Connecticut and moved with T.G. first to Kansas and then eventually to California. See Fratta L.R. 56(a)1 at 2 ¶ 7; Plaintiff's Opposition to Fratta and Marotta's MFSJ ("Opp. to Fratta's MSFJ"), Ex. G7 ("Pl.'s Aff. (Fratta)") (Doc. No. 214-3) at 3 ¶ 9. Gandy left A.S. to reside with Shakir in Connecticut. See Fratta L.R. 56(a)1 at 2 ¶ 7; Pl.'s Aff. (Fratta) at 3 ¶ 10. In December of 2008, Gandy returned temporarily to Connecticut and, on January 5, 2009, she reported to Stankye that Shakir had sexually assaulted T.G. when they had lived together. See Fratta L.R. 56(a)1 at 3 ¶ 7; Stankye L.R. 56(a)1 at 1 ¶ 2; Plaintiff's Local Rule 56(a)2 Statement of Facts in Response to Stankye's MFSJ ("Pl.'s L.R. 56(a)2 to Stankye") (Doc. No. 215-2) at 3 ¶ 2. Stankye reported Gandy's allegations to DCF, and Marotta assigned Fratta to investigate the allegations. See Stankye L.R. 56(a)1 at 1 ¶ 3; Pl.'s L.R. 56(a)2 to Stankye at 3 ¶ 3; Fratta L.R. 56(a)1 at 1 ¶ 3. On January 12, 2009, Stankye observed T.G. undergo a forensic interview at the Child Sexual Abuse Clinic at Yale New Haven Hospital ("Yale Clinic"). See Stankye L.R. 56(a)1 at 2 ¶ 4; Pl.'s L.R. 56(a)2 to Stankye at 4 ¶ 4.

On January 13, 2009, Fratta, Marotta, and DCF Program Manager Karen Grayson concluded that DCF had probable cause to believe that A.S. was in imminent risk of physical harm because he was living with Shakir and therefore similarly situated to T.G. at the time of her alleged sexual assault. See Fratta L.R. 56(a)1 at 4 ¶ 14; Plaintiff's Local Rule 56(a)2 Statement of Facts to Fratta's MFSJ ("Pl.'s L.R. 56(a)2 to

Fratta") (Doc. No. 214-2) at 6 ¶ 14.e.[3]  On January 14, Fratta visited Shakir's home and conducted a minimal facts interview with A.S. and Shakir.  See Fratta L.R. 56(a)1 at 5 ¶ 19, 6 ¶ 24; Pl.'s L.R. 56(a)2 to Fratta at 13 ¶ 19; 14 ¶ 24; Stankye L.R. 56(a)1, Ex. C at 1.  Based on her interview, Fratta found no evidence that Shakir had abused A.S., as well as no violations or unsafe conditions in Shakir's home.  See Fratta L.R. 56(a)1 at 7–8 ¶ 28; Pl.'s L.R. 56(a)2 to Fratta at 16 ¶ 28; Stankye L.R. 56(a)1, Ex. C at 1.  Fratta concluded that there were no immediate concerns to A.S.'s safety.  See Fratta L.R. 56(a)1 at 8 ¶ 29; Pl.'s L.R. 56(a)2 to Fratta at 16 ¶ 29.

After the interview, Shakir signed a DCF Service Agreement/Safety Plan.  See Stankye L.R. 56(a)1 at 3 ¶ 8; Fratta L.R. 56(a)1 at 8 ¶ 30; Pl.'s L.R. 56(a)2 to Fratta at 16 ¶ 30.  The Service Agreement stated that A.S. would undergo a forensic interview at the Yale Clinic.  See Stankye L.R. 56(a)1 at 3 ¶ 8; Fratta L.R. 56(a)1 at 8 ¶ 31; Plaintiff's Sealed Exhibits ("Pl.'s Sealed Exhibits") (Doc. No. 213), Ex. X ("Service Agreement") (Doc. No. 213-4).  It also stated that Shakir would "allow [A.S.] to stay with his paternal grandmother pending further investigation."  See Service Agreement.  The parties do not dispute that the signed agreement contains this language, but do disagree as to the interpretation of the requirement.  Fratta and Stankye interpret the agreement to require A.S. to stay with Shakir's mother, Khalila Shakir Browning, and to require Browning to care for A.S.  See Stankye L.R. 56(a)1 at 3 ¶ 9; Fratta L.R. 56(a)1 at 8 ¶ 32.  Shakir contends that the agreement did not specify that Browning would care for A.S., such as

---

[3] Shakir disputes the validity of their finding of probable cause, but does not dispute that Fratta, Marotta, and Grayson reached the conclusion that probable cause existed.  See Pl.'s L.R. 56(a)2 to Fratta and Marotta at 6 ¶ 14.

providing food, clothing, and rides, but rather that he would continue to serve that role. See Pl.'s L.R. 56(a)2 to Fratta at 17 ¶¶ 32–33; Pl.'s L.R. 56(a)2 to Stankye at 4 ¶¶ 8–9.

A.S.'s forensic interview at the Yale Clinic was scheduled for January 20, 2009, at 11:00 a.m., but the interview did not occur on that date because Shakir was late in bringing A.S. and because the Yale Clinic did not want to proceed with Shakir, a possible abuser, present. See Stankye L.R. 56(a)1 at 3 ¶ 10; Fratta L.R. 56(a)1 at 9 ¶ 36; Pl.'s L.R. 56(a)2 to Fratta at 19 ¶ 36. Shakir alleges that he was only made aware that his presence would be a problem on that date. See Pl.'s L.R. 56(a)2 to Stankye at 4–5 ¶¶ 12–13. DCF agreed to reschedule the interview, and Shakir agreed that Browning would bring A.S. to the rescheduled interview. See Stankye L.R. 56(a)1 at 4 ¶ 12; Pl.'s L.R. 56(a)2 to Fratta at 19 ¶ 36. Shakir alleges, however, that DCF never contacted him to reschedule. See Pl.'s L.R. 56(a)2 to Stankye at 5 ¶ 12.

On February 4, 2009, based on the evidence of Shakir's alleged conduct toward T.G., Stankye prepared an application and affidavit in support of a warrant for Shakir's arrest on charges of sexual assault in the first degree and risk of injury to or impairing the morals of a child. See Stankye L.R. 56(a)1 at 4 ¶ 14; Pl.'s L.R. 56(a)2 to Stankye at 5 ¶ 14. A judge issued the warrant later that day. See Stankye L.R. 56(a)1 at 4 ¶ 15; Pl.'s L.R. 56(a)2 to Stankye at 5 ¶ 15.

Stankye alleges that, "on or about" February 6, 2009, he then called Gandy to inform her that an arrest warrant for Shakir had been issued. See Stankye L.R. 56(a)1 at 4 ¶ 16. He alleges that Gandy indicated that she was in Connecticut and prepared to take custody of A.S. after the arrest. See id. Shakir disputes the timing of the phone call, alleging that Stankye kept in touch with Gandy while she was in California and

deliberately waited two days to execute the warrant until she informed him that she had returned to Connecticut. See Pl.'s L.R. 56(a)2 to Stankye at 5 ¶ 16. Shakir also alleges that Stankye was aware that Gandy intended to take A.S. back to California after she received custody. See id.; Plaintiff's Exhibits ("Pl.'s Exhibits") (Doc. No. 212), Ex. H (Doc. No. 212-7) at 85.

On February 6, 2009, Stankye and another detective attempted to serve the warrant at Shakir's place of employment, but Shakir was not at work that morning. See Stankye L.R. 56(a)1 at 5 ¶ 17–18; Pl.'s Exhibits, Ex. K11 (Doc. No. 212-27). Shakir alleges that he was not at work because he was taking A.S. to a doctor's appointment. See Pl.'s L.R. 56(a)2 to Stankye at 6 ¶¶ 18–19. Stankye acknowledges that he was informed by A.S.'s school that Shakir had picked up his son earlier that day, but does not mention knowledge of a doctor's appointment. See Stankye L.R. 56(a)1 at 5 ¶ 19.

Stankye, along with a Derby Police lieutenant and four officers, then went to Shakir's residence to serve the warrant. See Stankye L.R. 56(a)1 at 5 ¶ 20; Pl.'s L.R. 56(a)2 to Stankye at 6 ¶ 20. Prior to executing the warrant, Stankye called Browning to determine A.S.'s whereabouts and was informed that A.S. was with Browning and A.S.'s aunt. See Stankye L.R. 56(a)1 at 6–7 ¶ 26. Stankye requested that Browning bring A.S. to Shakir's residence, so he could confirm A.S.'s safety and well-being. See id. Shakir claims that Browning never informed him of this call, but does not have other evidence to dispute its occurrence. See Pl.'s L.R. 56(a)2 to Stankye at 7 ¶ 26.

After waiting an hour, during which time Browning had not brought A.S. to the house, Stankye and the other officers knocked on Shakir's door to execute the warrant, but Shakir did not initially respond. See Stankye L.R. 56(a)1 at 6 ¶¶ 22–23; Stankye

MFSJ, Ex. A ("Stankye Aff.") (Doc. No. 201-4) at 5 ¶ 18.  Shakir alleges that he delayed

in responding because he was comforting his son, who was traumatized by the officers

banging on the door.  See Pl.'s L.R. 56(a)2 to Stankye at 7 ¶¶ 22–23.  After 15-20

minutes, Shakir voluntarily exited his residence, and an officer handcuffed him and

placed him in a police vehicle.  See Stankye L.R. 56(a)1 at 7 ¶ 27; Pl.'s L.R. 56(a)2 to

Stankye at 7 ¶ 27.

      Once in the vehicle, Stankye asked Shakir at least twice about A.S.'s location,

and Shakir refused to answer.  See Stankye L.R. 56(a)1 at 7 ¶ 28; Pl.'s L.R. 56(a)2 at 8

¶ 28.  Stankye also affirms in his L.R. 56(a)1 Statement of Facts that he learned that

A.S. was not with Browning.  See Stankye L.R. 56(a)1 at 7 ¶ 26; Fratta MFSJ, Ex. A

("Fratta Aff.") at 10 ¶ 42.f.  In Stankye's Affidavit, however, he does not state that he

learned that A.S. was not with Browning; rather, he states that he was unable to confirm

that A.S. was with her, presumably because she did not bring A.S. to the residence, as

Stankye had requested.  See Stankye Aff. at 4 ¶ 17, 5 ¶ 21.  Stankye alleges that,

because they were unable to confirm A.S.'s location, he and the other officers

demanded entry into Shakir's residence to search for A.S.  See Stankye L.R. 56(a)1 at

7 ¶ 30.  Shakir disputes, however, that Stankye was unaware of A.S.'s whereabouts,

alleging that Stankye was informed earlier that day that Shakir had taken A.S. to a

doctor's appointment.  See Pl.'s L.R. 56(a)2 to Stankye at 7 ¶ 25, 30.  Shakir also

challenges the other bases cited for the officers' decision to enter his home.  See id. at

7 ¶ 30.  It is undisputed that the officers did not have a warrant for the entry.  See

Stankye L.R. 56(a)1 at 7 ¶ 30; Memorandum in Support of Stankye's MFSJ ("Stankye

Mem. in Supp.") (Doc. No. 201-1) at 18.

Shakir and Stankye also dispute what occurred during the entry and search. According to Stankye, Shakir's brother, Rasheed Shakir ("Rasheed"), opened the door in response to the demands made by the officers and granted them entry into the residence. See Stankye L.R. 56(a)1 at 8 ¶ 31. Stankye alleges that he was not aware of Rasheed's identity at the time. See id. According to Shakir, however, Stankye and the other officers knew his brother's identity, and Rasheed did not grant the officers entry into the home, but opened the door only under threat. See Pl.'s L.R. 56(a)2 to Stankye at 10 ¶ 31; Pl.'s Exhibits, Ex. V. The parties agree that officers, including Stankye, then entered the residence and observed bags packed with A.S.'s clothes. See Stankye L.R. 56(a)1 at 8 ¶ 31; Pl.'s L.R. 56(a)2 to Stankye at 10 ¶ 31. After locating A.S., Stankye and the other officers escorted A.S. out of the residence to a police vehicle. See Stankye L.R. 56(a)1 at 8 ¶¶ 31–32; Pl.'s L.R. 56(a)2 to Stankye at 10 ¶ 32. Shakir and A.S. were then transported separately to the Derby Police Department ("DPD"). See Stankye L.R. 56(a)1 at 8 ¶ 34; Pl.'s L.R. 56(a)2 to Stankye at 11 ¶ 34.

It is undisputed that Stankye was not the officer that transported Shakir to the DPD. See Stankye L.R. 56(a)1 at 9 ¶ 38; Pl.'s L.R. 56(a)2 to Stankye at 12 ¶ 38. Shakir alleges that Stankye did, however, transport him from the police vehicle to the lockup area. See Pl.'s L.R. 56(a)2 to Stankye at 12 ¶ 34. According to Shakir, at the DPD, Stankye taunted him about his high bail, required him to strip of his clothing, and left him in the holding cell. See Plaintiff's Opposition to Stankye MFSJ ("Opp. to Stankye MFSJ"), Affidavit ("Pl.'s Aff. (Stankye)") (Doc. No. 215-3) at 14 ¶¶ 63–65. Shakir further alleges that the air conditioning in his cell was turned up to maximum and

that he became physically sick as a result. See Pl.'s L.R. 56(a)2 to Stankye at 12 ¶ 40; Pl.'s Aff. (Stankye) at 14 ¶ 67. Shakir admits that he did not see Stankye or anyone else turn on the air conditioning, but infers that Stankye was responsible because Stankye was in charge of the search earlier that day. See Pl.'s L.R. 56(a)2 at 12 ¶ 39; Deposition by Shakir ("Shakir Dep. Tr.") (Doc. No. 216) at 90–91.

Stankye disputes all of these facts. He alleges that he did not use any physical force against Shakir on February 6, 2009, and that he did not have any contact with Shakir at the DPD on that date. See Stankye L.R. 56(a)1 at 9 ¶ 41; Stankye Aff. at 6 ¶¶ 28–29. Stankye further alleges that he did not know how to adjust the air conditioning at the police station, did not direct anyone else to do so, and is unaware of anyone having done so. See Stankye L.R. 56(a)1 at 9 ¶¶ 39–40.

While Shakir was in the holding cell, Stankye contacted Fratta and Grayson to inform them that A.S. was at the DPD. See Fratta L.R. 56(a)1 at 11 ¶ 44. Fratta and Stankye allege that Grayson authorized Fratta to interview A.S. See id.; Stankye L.R. 56(a)1 at 8 ¶ 34. Stankye further asserts that he did not participate in or observe the interview. See Stankye L.R. 56(a)1 at 8 ¶ 35. Shakir, however, states to the contrary that Fratta and Stankye agreed to the interview, and that Stankye was present. See Pl.'s L.R. 56(a)2 to Stankye at ¶ 7 34–35; Pl.'s L.R. 56(a)2 to Fratta at 27 ¶ 44. A.S. did not report any abuse during the interview. See Fratta L.R. 56(a)1 at 11 ¶ 47; Pl.'s L.R. 56(a)2 to Fratta at 27 ¶ 47.

The parties then agree that, after the interview, A.S. was released into Gandy's custody, but they dispute who authorized the transfer. See Stankye L.R. 56(a)1 at 9 ¶ 36; Pl.'s L.R. 56(a)2 to Stankye at 11 ¶ 36; Fratta L.R. 56(a)1 at 13 ¶ 57; Pl.'s L.R.

56(a)2 to Fratta at 28 ¶ 48.  Stankye alleges that Fratta consented to A.S.'s release to Gandy and that he has not seen A.S. since Gandy took him.  See Stankye L.R. 56(a)1 at 9 ¶¶ 36–37.  Fratta alleges that Stankye informed her that Gandy would be picking up A.S. and that Fratta and Gandy should leave the police station to avoid a confrontation with Browning.  See Fratta L.R. 56(a)1 at 11 ¶ 48, 12 ¶ 56.  Shakir alleges that Stankye, Fratta, and Marotta were aware that Gandy intended to bring A.S. back with her to California and conspired together to allow her to take him.  See Pl.'s L.R. 56(a)2 to Stankye at 5 ¶ 16; Pl.'s L.R. 56(a)2 to Fratta at 28 ¶ 48; Pl.'s Exhibits, Ex. Z at 3, 6.

Later that evening, Fratta learned that Shakir had been released on bond and intended to retake custody of Shakir.  See Fratta L.R. 56(a)1 at 13 ¶ 59; Pl.'s L.R. 56(a)2 to Fratta at 31 ¶ 59.  Fratta alleges that she was concerned about A.S.'s safety if he were placed in Shakir's care.  See Fratta L.R. 56(a)1 at 13 ¶ 60.  She spoke with Marotta, who spoke with Grayson, and Grayson determined that a service agreement for Gandy was unnecessary because Gandy had legal authority to have custody of A.S. and DCF had no safety concerns about her.  See id. at 14 ¶ 65.  Grayson further advised that Gandy should contact the police if Shakir attempted to retake A.S., and Fratta communicated this information to Gandy.  See id.  Shakir only disputes the bases for Grayson's determination, but not whether these communications took place.  See Pl.'s L.R. 56(a)2 to Fratta at 33–34 ¶¶ 65–66.

Shakir states that, after his release, he contacted Browning and the New Haven Police Department (NHPD) to request assistance in retaking custody of A.S.  See Pl.'s Aff. (Fratta) at 38–39.  Although Shakir drove to Gandy's mother's house, where he believed A.S. to be staying, he did not enter the home.  See id. at 39.  He alleges that

the police informed him that they had contacted DCF and were told by Marotta to leave A.S. with Gandy because she could keep A.S. as long as she did not leave the state. See id.; Pl.'s L.R. 56(a)2 to Fratta at 35–37 ¶¶ 69.e, 70–72. Fratta and Marotta dispute this and allege that neither of them received any calls on the DCF hotline from the NHPD between February 6 and February 8, 2009. See Fratta L.R. 56(a)1 at 14 ¶ 67. They allege that it was DCF Social Worker Kerry Cayward who spoke to Officer Josh Kyle, and it was DCF Social Workers Karen Ginand and Shawn Meaike who spoke to Officer Mastriano. See id. at 14–17 ¶¶ 68–75.

Shakir then alleges that, on February 7, a NHPD officer went to Gandy's mother's home and found neither A.S. nor Gandy there. See Pl.'s Aff. (Fratta) at 40. On February 11, 2009, Gandy called Fratta to inform her that Gandy and A.S. were in California. See Fratta L.R. 56(a)1 at 17 ¶ 76. Fratta provided relevant case information on Gandy and A.S. to the California Child Protection Services. See id. at 18 ¶ 77.

Fratta subsequently completed her investigation of both Gandy and Shakir. See Fratta L.R. 56(a)1 at 18 ¶ 78, 19 ¶ 83; Pl.'s L.R. 56(a)2 to Fratta at 39 ¶ 78, 40–41 ¶ 83. DCF initially substantiated the allegations of physical neglect against Gandy, but reversed that finding on appeal. See Fratta L.R. 56(a)1 at 18–19 ¶¶ 79–82; Pl.'s L.R. 56(a)2 to Fratta at 39–40 ¶¶ 78–82.[4] DCF substantiated the allegations of sexual abuse of T.G. against Shakir and upheld the substantiation on appeal. See Fratta L.R. 56(a)1 at 19–20 ¶¶ 83–87; Pl.'s L.R. 56(a)2 to Fratta at 40–41 ¶¶ 83–87.[5]

---

[4] Although Shakir disputes the bases on which DCF reversed the finding of physical neglect on appeal, he does not dispute the outcome of the appeal. See Pl.'s L.R. 56(a)2 to Fratta at 78–82.

[5] Again, Shakir disputes the bases of the substantiation of sexual abuse against him, but not the fact that DCF found the allegations substantiated. See Pl.'s L.R. 56(a)2 to Fratta at 40–41 ¶¶ 83–87.

On February 25, 2009, Shakir attended a hearing before the Derby Probate Court regarding an application that he had previously filed on December 31, 2008, for temporary custody of A.S. and to remove Gandy as A.S.'s guardian. <u>See</u> Fratta L.R. 56(a)1 at 20 ¶ 88; Pl.'s L.R. 56(a)2 to Fratta at 41 ¶ 88. The probate judge did not grant Stankye's application. <u>See</u> Stankye L.R. 56(a)1 at 10 ¶¶ 43–44; Pl.'s L.R. 56(a)2 to Stankye at 13 ¶ 43. Fratta alleges that the probate judge explained to Shakir that, because there were no court orders or written custody agreements between Shakir and Gandy, Shakir and Gandy each had equal legal rights to A.S. <u>See</u> Fratta L.R. 56(a)1 at 20 ¶ 94. Shakir disputes that this occurred. <u>See</u> Pl.'s L.R. 56(a)2 to Fratta at 42 ¶ 94. Shakir alleges instead that his attorney told him that the probate judge stated that A.S. should not have been taken out of Connecticut without a court order and should be returned immediately to the state. <u>See</u> <u>id.</u>; Pl.'s L.R. 56(a)2 to Stankye at 13 ¶ 43.

## V. DISCUSSION

Stankye raises eight arguments in support of his Motion for Summary Judgment. He contends: (1) that Shakir's request for declaratory relief is barred by the Eleventh Amendment; (2) that Shakir has no standing to assert a claim of unlawful seizure on behalf of his son; (3) that Shakir fails to raise a genuine issue of material fact that the entry into his residence was an unlawful search; (4) that Shakir fails to raise a genuine issue of material fact that his procedural due process rights were violated; (5) that Shakir fails to raise a genuine issue of material fact that his substantive due process rights were violated; (6) that the Eighth Amendment does not apply to Stankye's conduct, which occurred prior to Shakir's conviction for any crime; (7) that Shakir fails to raise a genuine issue of material fact that Stankye participated in a conspiracy to

deprive him of his rights; and (8) that he is entitled to qualified immunity as to Shakir's Fourth and Fourteenth Amendment claims.[6]  See Stankye Mem. in Supp.

Fratta and Marotta separately assert five arguments in support of their Motion. They contend: (1) that Shakir fails to raise a genuine issue of material fact that Marotta was personally involved in any violation of Shakir's constitutional rights; (2) that Shakir fails to raise a genuine issue of material fact that his procedural due process rights were violated; (3) that Shakir fails to raise a genuine issue of material fact that his substantive due process rights were violated; (4) that Shakir fails to raise a genuine issue of material fact that Fratta and Marotta participated in a conspiracy to deprive him of his rights; and (5) that they are entitled to qualified immunity.  See Memorandum in Support of Fratta and Marott's MFSJ ("Fratta and Marotta Mem. in Supp.") (Doc. No. 198-1). Because of the overlap in the arguments in the two Motions, the court addresses them together.

A.    Personal Involvement (Marotta)

First, Marotta argues that Shakir has not presented evidence raising a genuine issue of material fact as to her personal involvement in any violation of his due process rights.  See Fratta Mem. in Supp. at 33–35.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d

---

[6] Although Stankye argues that he is entitled to qualified immunity "from plaintiff's principle Fourth and Fourteenth Amendment claims, as well as his other legally deficient claims," his argument focuses on the reasonableness of the search and removal of A.S. without mentioning Shakir's conditions of confinement at the DPD.  Stankye Mem. in Supp. at 27–28 (emphasis added).

496, 501 (2d Cir. 1994)).  In the case of supervisory defendants, the Second Circuit has

held that personal involvement can be established by showing that:

> (1) the defendant participated directly in the alleged
> constitutional violation, (2) the defendant, after being informed
> of the violation through a report or appeal, failed to remedy
> the wrong, (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant was
> grossly negligent in supervising subordinates who committed
> the wrongful acts, or (5) the defendant exhibited deliberate
> indifference to the rights of [the plaintiffs] by failing to act on
> information indicating that unconstitutional acts were
> occurring.

Id.  A supervisory official cannot be held liable solely "on the basis of respondeat

superior or simply because he is atop the . . . hierarchy."  Lewis v. Cunningham, 483

Fed. App'x 617, 619–20 (2d Cir. 2012).

In Ashcroft v. Iqbal, the Supreme Court addressed the issue of supervisory

liability and concluded that "a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."

556 U.S. 662, 676 (2009).  The Second Circuit has since recognized that Iqbal "may

have heightened the requirements for showing a supervisor's personal involvement with

respect to certain constitutional violations," but has not articulated whether or how Iqbal

affects the categories of supervisory liability set forth by Colon.  Grullon v. City of New

Haven, 720 F.3d 133, 139 (2d Cir. 2013); see also Raspardo v. Carlone, 770 F.3d 97,

117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability

test . . . after Iqbal.").  In the absence of contrary instruction from the Second Circuit,

then, the court follows Colon and other courts in this District and applies the categories

established by Colon, especially as Shakir appears to style his arguments for

supervisory liability in accordance with these categories.  See Alston v. Pafumi, No.

3:09-CV-1978 (VAB), 2016 WL 81785, at *7 n.5 (D. Conn. Jan. 7, 2016); Tyus v.

Newton, No. 3:13-CV-1486 (SRU), 2015 WL 1471643, at *8 (D. Conn. Mar. 31, 2015);

Reynolds v. Murphy, No. 3:13-CV-316 (SRU), 2015 WL 1456880, at *2 (D. Conn. Mar.

30, 2015).

Shakir argues that Marotta was personally involved in the violation of his

constitutional rights under three of the above categories.[7]  First, he argues that she

directly participated in the violation of his due process rights by telling the New Haven

Police Department ("NHPD") to leave A.S. in the care of Gandy.  See Memorandum in

Opposition to Fratta MFSJ ("Mem. in Opp. to Fratta") (Doc. No. 214-1) at 60.  Second,

he argues that Marotta was informed of the conspiracy to deprive him of custody of A.S.

and failed to take action to remedy the wrong.  See id. at 60–62.  Finally, he argues that

Marotta created a policy or custom sanctioning the violations.  See id. at 62–66.

Under the first category of direct supervisory liability, Shakir does not allege that

Marotta participated in the removal of A.S. from Shakir's home, the interview of A.S. at

the DPD,[8] or the release of A.S. into Gandy's custody.  The only direct participation that

---

[7] Shakir alludes briefly to the other two categories by mentioning in one conclusory sentence the language of gross negligence and deliberate indifference, but he does not present any arguments to support a claim of personal involvement under either category.  See Mem. in Opp. to Fratta at 65 ("Kathie Moratta [sic] was also, grossly negligent in supervising Michele Fratta, who caused along with Moratta the violations and exhibited deliberate indifference in doing so, by failing to act on information received by Fratta indicating constitutional deprivations were taking place.").  As these arguments were not briefed, the court focuses its analysis on the first three categories of supervisory liability.

[8] In his L.R. 56(a)2 statement, Shakir makes one mention of an additional "unconsented" interview of A.S. performed by Marotta after Fratta's interview at the DPD.  See Pl.'s L.R. 56(a)2 to Fratta at 31 ¶ 58.d.  However, he has no personal knowledge of the interview occurring, as he was detained at the police station at the time.  Instead, he cites to a DCF report, which states, "ISW met with Anwar Jr. at the DCF office."  Pl.'s Sealed Exhibits, Ex. C3 at 2 ¶ 8.  The document, however, does not indicate that "ISW" refers to Marotta.  Additionally, the context surrounding the sentence appears to indicate that "DCF" was a typo.  See infra note 15.  Shakir does not mention this alleged interview in his response to Marotta's personal involvement argument, see Mem. in Opp. to Fratta at 60–66, and he has not presented admissible evidence to substantiate that the alleged interview occurred.  Therefore, the court focuses its analysis only on Marotta's alleged statements to the NHPD.

Shakir identifies in his Memorandum is Marotta's alleged statement to NHPD Officer

Mastriano to "stand down leave Jr. in the care of Ms. Gandy." See id. at 60. However,

Shakir has not presented admissible evidence to raise a genuine issue of material fact

that it was Marotta who made the alleged statements to the NHPD.

According to Marotta's Affidavit, the one time that she spoke with Gandy was in

January, at which time she informed Gandy that she was not an attorney and could not

provide legal advice. See Fratta MFSJ, Ex. B ("Marotta Aff.") (Doc. No. 198-3) at 5 ¶

21. Marotta states that she was not present during the phone calls on February 6,

2009, between Stankye, Fratta, and Grayson about Shakir's arrest and A.S.'s interview.

See id. at 5 ¶ 22. Fratta informed her later that day of what had occurred, as well as of

Stankye's concerns that Shakir would try to retake custody of A.S. after Shakir's release

on bond. See id. at 5 ¶ 23; see also Fratta Aff. at 14 ¶ 66. Marotta then contacted

Grayson, and Fratta and Marotta both state that it was Grayson who determined that

Gandy should contact the police department if Shakir attempted to retake A.S. See

Marotta Aff. at 5 ¶ 24; Fratta Aff. at 14 ¶ 66. Fratta, not Marotta, relayed Grayson's

advice to Gandy. See Fratta Aff. at 14 ¶ 67.

Marotta further avers that she was not at work from the late evening of February

6, 2009, to February 8, 2009, and thus did not receive any phone calls from the NHPD

concerning Shakir. See Marotta Aff. at 5 ¶ 25. She only learned of the calls on

February 9, 2009, after the events had transpired. See id. at 6 ¶ 26. According to

Fratta and Marotta, NHPD Officer Josh Kyle spoke with DCF Social Worker Kerry

Cayward, and NHPD Officer Mastriano spoke with DCF Social Workers Karen Ginand

and Shawn Meaike.  See id. at 6 ¶ 26; Fratta Aff. at 14–17 ¶¶ 70–74; Fratta MFSJ, Ex.

E ("Cayward Aff.") (Doc. No. 198-6); id., Ex. F ("Meaike Aff.") (Doc. No. 198-7).

Shakir alleges to the contrary that Officers Kyle and Mastriano spoke to Marotta,

who informed them to "stand down" and leave A.S. with Gandy.  See Pl.'s L.R. 56(a)2 to

Fratta at 34 ¶ 68, 35 ¶ 69.e, 36 ¶ 71, 39 ¶ 74.  To support this allegation, he cites to his

own Affidavit and to Marotta's answers to his interrogatories.  See id.  His Affidavit

states that Officer Kyle told Shakir that he had spoken to Marotta and that Marotta had

told him to leave A.S. in Gandy's care because as long as Gandy did not leave the

state, she could keep A.S.  See Pl.'s Aff. (Fratta) at 39, 40, 42.  This statement is

inadmissible hearsay, however,[9] and therefore cannot be the basis for establishing a

genuine issue of material fact.  See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)

("[O]nly admissible evidence need be considered by the trial court in ruling on a motion

for summary judgment."); Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001).

Nor does Marotta's answer to Shakir's interrogatory create a genuine issue of

material fact.  In response to Shakir's question, "Do you deny or admit that you told the

officers to leave Anwar, Jr. with the plaintiff's ex, as long as she does not leave CT, she

can have Anwar in her care?," Marotta answered, "Deny in part and admit in part.  DCF

Hotline received a phone call from New Haven Police Officer Mastriano and he reported

the paternal grandmother was attempting to get Anwar, Jr. back in her care."  Pl.'s

Exhibits, Ex. A1 at 4.  Her statement admits neither that the alleged statement was

---

[9] While Marotta's underlying statement to Officer Kyle is not hearsay because it is a statement by the party opponent, see Fed. R. Evid. 801(d)(2)(A), Officer Kyle's statement to Shakir is a hearsay statement offered for the truth of the matter and not subject to any exception, see Fed. R. Evid. 801(c) & 802.

made nor that she was the one who spoke with Officer Mastriano.  Shakir attempts to

reason that her answer supports an inference that she made the statement because it is

not a straight denial, as is Fratta's answer to the same question.  See Mem. in Opp. to

Fratta at 60.  This reasoning, however, misreads Marotta's answer and relies purely on

speculation.  Therefore, as neither Marotta's answer nor Shakir's Affidavit presents

admissible evidence that Marotta spoke with either NHPD officer, Shakir has not raised

a genuine issue of fact that Marotta directly participated in a constitutional violation.

Under the second Colon category, Shakir argues in the alternative that Marotta

was aware of the conspiracy to violate his constitutional rights and failed to remedy the

violation.  See id. at 60–62.  Again, however, he has not introduced admissible evidence

to create a genuine issue of material fact as to her awareness of the key components of

the alleged conspiracy or underlying constitutional violations.  In her Affidavit and

answers to Shakir's interrogatories, Marotta denies being informed by Stankye of the

arrest warrant prior to its execution, agreeing to or participating in the interview of A.S.

at the police department, or being aware of Gandy's plans to leave Connecticut with

A.S.  See Pl.'s Exhibits, Ex. A1 at 3, 5; Marotta Aff. at 5 ¶¶ 22–25.  She avers that she

was only informed of the arrest, interview, and release of A.S. to Gandy after the fact, in

the late afternoon on February 6, 2009.  See Marotta Aff. at 5 ¶ 23.  Even then, she

does not admit to knowledge of any plans for relocation.  See id.  She was, however,

aware of Grayson's decision to advise Gandy to contact the police department if Shakir

attempted to retake A.S. after his release on bond.  See id. at 5 ¶ 24.  None of this

information, relayed after the fact, was communicated as a report or appeal to alert her

to a constitutional violation. Based on this limited information alone, Marotta would not have been reasonably apprised that a violation was occurring.

Shakir has introduced no admissible evidence contradicting Marotta's Affidavit. He cites Stankye's deposition as evidence that Stankye told Marotta about the arrest warrant, but Stankye's deposition states merely that he called "DCF" and does not specify to whom at DCF Stankye spoke. See Mem. in Opp. to Fratta at 60–61; Pl.'s Exhibits, Ex. H at 88–89. Shakir presents no corroborating evidence indicating that person was Marotta. Additionally, he attempts to reason from the fact that Marotta was Fratta's supervisor that Fratta conveyed all of the information of which she was aware to Marotta. See Mem. in Opp. to Fratta at 61–62. This assumption, however, is unfounded, has no evidentiary basis, and relies on speculation, as Shakir has no personal knowledge of what information was or was not communicated between Fratta and Marotta. Moreover, there is no evidence that Marotta received a report of any wrongdoing or unconstitutional action. Therefore, Shakir has not created a genuine issue of material fact that Marotta was informed of a constitutional violation that had to be remedied. Her failure to take action to remedy a violation of which she was not sufficiently aware cannot be the basis for a finding of personal involvement.

Finally, Shakir argues that Marotta created a policy or custom that sanctioned the constitutional violation. See Mem. in Opp. to Fratta at 62–66. Shakir mistakenly cites Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), to support his claim. See Mem. in Opp to Fratta at 62–66. However, Monell establishes the standard for finding municipal liability, not supervisory liability, and therefore is not applicable to Marotta. Additionally, Shakir has introduced no evidence of a policy or

custom created by Marotta. Instead, he again relies on the actions of Fratta and attributes them to Marotta merely because Fratta was under Marotta's supervision. See id. at 62–63. As noted above, he presents no evidence that Marotta authorized Fratta's conduct, including the interview of A.S. or the release of A.S. to Gandy. Therefore, Shakir has raised no general issue of material fact as to whether Marotta created a policy or custom permitting the constitutional violation he alleges occurred.

Because Shakir has offered no evidence on which a reasonable jury could find that Marotta was personally involved in the deprivation of Shakir's rights under any of the three categories for supervisory liability, no genuine issue of material fact exists as to Marotta's liability, and she is entitled to summary judgment. Accordingly, Fratta and Marotta's Motion for Summary Judgment is granted as to all claims against Marotta. The remainder of the Ruling only addresses claims as to Fratta and Stankye.

B.    Procedural Due Process (Fratta and Stankye)

Shakir claims that Stankye and Fratta violated his procedural due process rights by depriving him of custody of A.S. without a hearing. See Am. Compl. at 14 ¶ 55, 17–18 ¶ 65. Stankye and Fratta both argue in their respective Motions for Summary Judgment that their conduct did not constitute a deprivation of custody and thus did not implicate Shakir's procedural due process rights. See Stankye Mem. in Supp. at 12–13; Fratta Mem. in Supp. at 19–26. Stankye additionally argues that, even if his conduct did implicate Shakir's due process rights, those rights were not violated because a pre-deprivation hearing was unnecessary due to emergency circumstances. See Stankye Mem. in Supp. at 13–16. Finally, both Stankye and Fratta argue that, even if a genuine issue of fact exists as to whether their conduct violated Shakir's due process rights, they

23

are protected by qualified immunity because their conduct was objectively reasonable. See Stankye Mem. in Supp. at 25–28; Fratta Mem. in Supp. at 37–39.

Although Shakir's Memoranda are not expressly clear, the court reads his argument liberally to identify four actions by which Shakir asserts that Stankye and/or Fratta deprived him of the custody, care, and management of A.S. See Memorandum in Opposition to Stankye's MFSJ ("Mem. in Opp. to Stankye") (Doc. No. 215-1) at 19–21; Mem. in Opp. to Fratta at 16–43. First, Shakir argues that Stankye deprived him of custody by physically removing A.S. from his residence after Shakir's arrest. See Mem. in Opp. to Stankye at 19–20. The bulk of Shakir's argument against Stankye focuses on this conduct. Second, Shakir argues that Fratta's interview of A.S. at the DPD, which Stankye permitted and facilitated, deprived him of his liberty interest in the care and management of A.S. because he did not consent to the interview. See Mem. in Opp. to Fratta at 34–36; Mem. in Opp. to Stankye at 20–21. Third, Shakir argues that Stankye and/or Fratta improperly released A.S. into the custody of Gandy in violation of their Service Agreement. See Mem. in Opp. to Fratta at 16–19; Mem. in Opp. to Stankye at 21. Finally, Shakir argues that Stankye and Fratta conspired with Gandy to assist her in relocating A.S. to California. See Mem. in Opp. to Fratta at 52–59; Mem. in Opp. to Stankye at 21. The court addresses each theory in turn.

1.     Applicable Law

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to prevail on a Fourteenth Amendment procedural due process claim, a plaintiff must show (1) that he possessed a protected liberty or property interest of which he has been deprived; and (2) that the procedures afforded to him

were not constitutionally sufficient. See <u>Victory v. Pataki</u>, 814 F.3d. 47, 59 (2d Cir. 2016) (citing <u>Swarthout v. Cooke</u>, 562 U.S. 216, 219 (2011)).

Parents have a constitutionally protected interest in maintaining custody of their children. See <u>Troxel v. Granville</u>, 530 U.S. 57, 65–66 (2000) (collecting cases recognizing the "fundamental right of parents to make decisions concerning the care, custody and control of their children"); <u>Quilloin v. Walcott</u>, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 593 (2d Cir. 1999) ("[P]arents . . . have a constitutionally protected liberty interest in the care, custody and management of their children."). Therefore, "before parents may be deprived of the care, custody, or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal— must be accorded to them." <u>Tenenbaum</u>, 193 F.3d at 593.

However, where no deprivation of custody, care, or management has occurred, the plaintiff's procedural due process rights have not been triggered. See <u>Frazier v. Williams</u>, No. 15-CV-6531-KAMLB, 2016 WL 2644897, at *3 (E.D.N.Y. May 9, 2016), <u>appeal dismissed</u> (Aug. 18, 2016) ("Where a state actor has not removed a child from a parent's custody, however, there has been no deprivation entitling a parent to procedural due process."); <u>Guan N. v. NYC Dep't of Educ.</u>, No. 11 CIV. 4299 AJN, 2014 WL 1275487, at *24 (S.D.N.Y. Mar. 24, 2014) ("[W]ithout that deprivation [of custody, care, and management], the Constitution would not require an inquiry into whether the defendants had provided due process."). In such cases, the plaintiff's rights have not been violated, regardless of whether a hearing was provided.

Additionally, even where a deprivation has occurred, officials may temporarily remove a child from the parent's custody without consent or court order in "emergency" circumstances. Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987). The Second Circuit has found that emergency circumstances include, but are not limited to, "the peril of sexual abuse, the risk that children will be left bereft of care and supervision, and immediate threat[s] to the safety of the child." Southerland v. City of New York, 680 F.3d 127, 149 (2d Cir. 2012) (internal quotation marks and citations omitted).

Finally, even if a plaintiff's procedural due process rights have been violated, a government official is nonetheless not liable if he is entitled to qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Public officials can establish qualified immunity in one of two ways: by demonstrating (1) that "their conduct does not violate clearly established constitutional rights," or (2) that "it was objectively reasonable for them to believe their acts did not violate those rights." Southerland v. City of New York, 680 F.3d 127, 141 (2d Cir. 2012) (quoting Holcomb v. Lykens, 337 F.3d 217, 220 (2d Cir.2003)).

Under the first approach to qualified immunity, a right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). A court in this District may only look to Supreme Court and Second Circuit precedent existing at the time to

determine if the right is clearly established.  See Moore v. Vega, 371 F.3d 110, 114 (2d

Cir. 2004).  While there is no requirement that a case have been decided that is directly

on point, the "existing precedent must have placed the statutory or constitutional

question beyond debate."  Al-Kidd, 563 U.S. at 741.  "[A] broad general proposition"

does not constitute a clearly established right.  Reichle v. Howards, 566 U.S. 658, 665

(2012).  Rather, the constitutional right violated must be "particularized to the facts of

the case."  White v. Pauly, 137 S. Ct. 548, 552 (2017); see also Gilles v. Repicky, 511

F.3d 239, 244 (2d Cir. 2007) ("The inquiry into whether a right at issue was clearly

established is tied to the specific facts and context of the case.").

Even if the law is clearly established, a public official may still be entitled to

qualified immunity "if it was objectively reasonable for him at the time of the challenged

action to believe his acts were lawful."  Taravella v. Town of Wolcott, 599 F.3d 129, 134

(2d Cir. 2010) (internal quotation marks and citation omitted).  In cases involving the

removal of children from parental custody, the Second Circuit has held that "a

caseworker is . . . entitled to qualified immunity if officers of reasonable competence

could disagree on the legality of the action at issue in its particular factual context."

Southerland, 680 F.3d at 141 (internal quotation marks omitted).

2.      Removal of A.S. from Shakir's Home

It is undisputed that, after Shakir was arrested and taken into police custody,

Stankye and other officers entered Shakir's home, removed A.S., and brought him to

the police station.  See Stankye L.R. 56(a)1 at 8 ¶¶ 31–32; Stankye Aff. at 6–7 ¶¶ 23–

24; Pl.'s L.R. 56(a)2 to Stankye at 10–11 ¶¶ 32, 34; Pl.'s Aff. (Stankye) at 13 ¶ 55.

Fratta does dispute her involvement in Stankye's actions.  See Fratta Aff. at 10–11 ¶ 45.

However, because the court concludes that Stankye's actions did not deprive Shakir of

a protected liberty interest, it need not decide whether a genuine dispute of fact exists as to the degree of Fratta's involvement.

While the Second Circuit has not delineated the boundaries of "what . . . kinds of government action may violate a parent's protected liberty interest in the care, custody, and management of his or her child in the child abuse context," it has stated that physical removal of the child from the parent's custody implicates this liberty interest. Phillips v. Cty. of Orange, 894 F. Supp. 2d 345, 374–75 (S.D.N.Y. 2012) (collecting Second Circuit cases assessing due process after a physical removal). The procedural due process cases, however, do not provide a clear definition of what constitutes the parent's custody in this context. In the absence of a clear definition of custody provided by other courts, the court looks to Black's Law Dictionary, which defines "custody" as the "care, control, and maintenance of a child awarded by a court to a responsible adult," including two components—"legal custody (decision-making authority) and physical custody (caregiving authority)." Custody, Black's Law Dictionary (10th ed.). Legal custody refers to the "authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare," while physical custody refers to the "right to have the child live with the person awarded custody."[10] Id.

_____

[10] The court also considers the definition of guardian and custodian as used in state family and probate law. The court recognizes that state law does not establish a constitutional liberty interest under the Due Process Clause and looks to the Connecticut General Statutes here merely as reference for how other courts have approached the definition of custody. See Uwadiegwu v. Dep't of Soc. Servs. of the Cty. of Suffolk, 91 F. Supp. 3d 391, 396 (E.D.N.Y. 2015), aff'd, 639 F. App'x 13 (2d Cir. 2016). Section 45a-504 of the Connecticut General Statutes defines "guardianship" to include "(A) [t]he obligation of care and control; (B) the authority to make major decisions affecting the minor's education and welfare, including, but not limited to, consent determinations regarding marriage, enlistment in the armed forces and major medical, psychiatric or surgical treatment; and (C) upon the death of the minor, the authority to make decisions concerning funeral arrangements and the disposition of the body of the minor." Conn. Gen. Stat. § 45a-604(5) (2017); see also Conn. Gen. Stat. § 17a-93(4) (2017). Connecticut courts have recognized, though, a distinction between guardianship and custody. See In re Joseph W., Jr., 121 Conn. App. 605, 630, 632 (2010), aff'd, 301 Conn. 245 (2011) (distinguishing custodian from guardian as "the parent or person with whom a minor child resides, at all times or from time to time, and who assumes

The case law regarding the due process required when a child is removed after the parent has been arrested is sparse because many cases involving this set of facts do not raise a procedural due process claim at all. See, e.g., United States v. Bradley, 321 F.3d 1212, 1213–14 (9th Cir. 2003); United States v. Reid, No. 4:11-CR-499 JCH/DDN, 2012 WL 628910, at *6 (E.D. Mo. Feb. 7, 2012), report and recommendation adopted, No. 4:11CR499 JCH DDN, 2012 WL 628907 (E.D. Mo. Feb. 27, 2012), aff'd, 769 F.3d 990 (8th Cir. 2014). In one instance, the Second Circuit did consider a due process claim when the children were removed from a neighbor's custody while the mother was receiving inpatient psychiatric treatment, but the case contained additional facts, such as emergency placement of the children and refusal to return the children after the mother was released, that went significantly beyond the actions taken by Stankye here. See Duchesne v. Sugarman, 566 F.2d 817, 825–28 (2d Cir. 1977).[11]

---

the responsibility for all or part of the day-to-day care and supervision of the child"). Thus, state law reinforces the existence of a legal and a physical component to custody.

[11] In Duchesne, the Second Circuit found a deprivation of custody where the Bureau of Child Welfare assumed custody of two children who were placed by the mother in the care of their neighbor before she checked herself into in-patient psychiatric treatment. See id. at 822, 825–26. In that case, however, the Bureau did not merely remove the children temporarily, but "assumed custody" and placed one child at St. Joseph's Home for Children and the other at New York Foundling Hospital. See id. at 822–23. When the mother was released from the hospital, she requested the return of her children, but the Bureau denied her requests and placed her children in foster care. See id. at 823–24. The court held that a liberty interest had been denied, and although emergency circumstances existed that excused a pre-deprivation hearing, due process required post-deprivation judicial proceedings to ratify the deprivation of custody. See id. at 825–28.

That case does not, however, answer the question before the court here because the Second Circuit in Duchesne focused primarily on the Bureau's refusal to return the children after the mother's release. See id. at 825 ("Nor can there be any question that appellants were deprived of their right to live together as a family by the refusal to return the children to the custody of the mother."). Its brief analysis of the initial removal while the mother was in the hospital accepted the trial court's finding of emergency circumstances, thereby assuming without explaining that the removal was a deprivation of custody. See id. at 825–26 (agreeing with the trial court that "[t]he initial custody in December 1969 was clearly proper since the facts show an emergency situation with the mother in the psychiatric ward of Bellevue Hospital and no one to take care of the children"). Stankye's conduct differs from the Bureau's conduct in Duchesne because he took no steps to assume custody or make emergency placements of A.S., but

Accordingly, the court does not consider <u>Duchesne</u> to answer the question before the court here.

In this case, Shakir has not raised a genuine dispute of fact that Stankye has deprived him of either legal or physical custody of A.S. because Stankye removed A.S. from the house and brought him to the police station only after Shakir's arrest.  First, Shakir's legal rights with respect to his son were not changed by Stankye's actions on February 6, 2009, nor does Shakir allege that they were.  Although Gandy ultimately took his son to California, Shakir had recourse in state court to seek a court order regarding custody of A.S.  <u>See</u> Conn. Gen. Stat. § 46b-56(a).  Second, Shakir did not have physical custody of A.S. at the time that Stankye removed A.S. from the residence and brought him to the police station.[12]  Shakir had already been arrested and taken into police custody by the time Stankye and the other officers entered the residence to search for A.S.  <u>See</u> Pl.'s Aff. (Stankye) at 11-13 ¶¶ 46, 48-55; Stankye Aff. at 5 ¶¶ 19–23.  Shakir himself states that he left A.S. in his brother's care before turning himself in.  <u>See</u> Pl.'s Aff. (Stankye) at 13 ¶ 55; Pl.'s L.R. 56(a)2 to Stankye at 10 ¶ 30(f); Mem. in Opp. to Fratta at 30 (stating that "he [Shakir] specifically left his son in the care of his brother, who was now Jr.'s [A.S.'s] guardian").  This reflects Shakir's own awareness that he could not maintain physical custody of his son while he was detained in jail.

---

merely brought A.S. temporarily to the police station before releasing him to his mother, the joint legal guardian.

[12] In addition to Shakir's self-identified transfer of A.S. to Shakir's brother, Rasheed, the court also notes that the signed Service Agreement required A.S. to stay with Browning while the DCF investigation against Shakir was pending.  <u>See</u> Service Agreement.  Because Shakir disputes the meaning of this requirement, however, <u>see</u> Pl.'s L.R. 56(a)2 to Stankye at 4 ¶¶ 8–9; Shakir Dep. Tr. at 41–43, the court focuses its analysis on Shakir's transfer of A.S. to Rasheed, which Shakir does not dispute.

Because Shakir does not claim to have had physical custody of A.S. at the time, then, he has not raised a genuine dispute of fact as to whether Stankye removed A.S. from his custody when he took A.S. from the house to the police station. Thus, the evidence, interpreted in the light most favorable to Shakir, is insufficient for a reasonable jury to find a deprivation of custody triggering due process, and Stankye is entitled to judgment as a matter of law. Because there was no deprivation of custody, the court need not consider the parties' dispute over emergency circumstances.

Alternatively, even if Stankye's removal of A.S. from the house to the police station did deprive Shakir of a protected liberty interest, Stankye is entitled to summary judgment on the ground of qualified immunity. Although Stankye focuses his qualified immunity argument on the second prong of objective reasonableness, see Stankye Mem. in Supp. at 27–28, the court concludes that the first prong is more appropriate. Given the court's own difficulty in finding case law as to whether removal of a child after the parent has already been arrested constitutes a deprivation of custody, the court concludes that the law was not clearly established at the time.[13] The court is not aware of, nor has Shakir identified, any Second Circuit precedent holding that a removal under such circumstances deprives the plaintiff of a protected liberty interest under the Due

---

[13] Although the law at the time was clearly established that parents had a constitutionally protected interest in the custody of their children, see, e.g., Tenenbaum, 193 F.3d at 593, a clearly established right cannot be a broad proposition, but must be particularized to the facts, see White, 137 S. Ct. at 552. In this case, then, the court looks to see whether every reasonable officer at the time would have understood that removing a child after his parent had already been arrested and taken into police custody would constitute a deprivation of custody triggering due process requirements. See Ashcroft v. Al-Kidd, 563 U.S. at 741.

Process Clause.[14]  Given the ambiguity in the law, Stankye is alternatively entitled to summary judgment on qualified immunity grounds as a matter of law.

### 3.    Interview of A.S. at Derby Police Department

Next, Shakir argues that Fratta's interview of A.S. at the Derby Police Department deprived him of the care and management of A.S. because it occurred without his consent.  See Mem. in Opp. to Fratta at 34–36; Mem. in Opp. to Stankye at 20–21.  It is undisputed that Fratta interviewed A.S. at the police station,[15] but the parties do dispute who authorized the interview and the degree to which Stankye was involved.  See Stankye L.R. 56(a)1 at 8 ¶¶ 34–35; Pl.'s L.R. 56(a)2 to Stankye at 11 ¶¶ 34–35; Fratta L.R. 56(a)1 at 11 ¶¶ 44–46; Pl.'s L.R. 56(a)2 to Fratta at 27 ¶¶ 44–46.  Again, however, because the court concludes that no genuine issue of fact exists as to whether Fratta's interview deprived Shakir of a protected liberty interest, the court need not determine whether the evidence in the record is sufficient to create a genuine dispute as to the issue of responsibility.

---

[14] As noted above in footnote 11, the court does not consider the Second Circuit's decision in Duchesne to answer the question in this case first, because it involved formal steps to assume custody and make placements and second, because the court focused on the Bureau's refusal to return the children after their mother's release.

[15] As noted previously in footnote 8, Shakir appears to allege that another interview also took place on February 6, 2009, at DCF, after the interview at the DPD.  See Pl.'s L.R. 56(a)2 to Fratta at 31 ¶ 58.d (citing Pl.'s Sealed Exhibits, Ex. C3 at 2 ¶ 8).  The paragraph that he cites to states that "ISW met with Anwar Jr. at the DCF office," but the surrounding text indicates that this statement is likely a typo and refers to the same interview that occurred at the DPD.  Pl.'s Sealed Exhibits, Ex. C3 at 2 ¶ 8.  The content of the interview recounted in Exhibit C3 is the same as that reported elsewhere in the record concerning the interview at the DPD, and a later paragraph indicates that Gandy arrived at the police station and picked A.S. up from there, rather than from DCF.  See id. at 2 ¶¶ 9–10.

Shakir does not cite to any other evidence of a second interview at DCF and does not have personal knowledge of any such interview occurring, as he was detained at the police station at that time.  Therefore, the court focuses its discussion on the interview at the DPD, although it notes that the analysis would be the same even if there were a second interview.

The court concludes as a matter of law that an unconsented interview by DCF, without more, does not amount to a deprivation of care or management under the Due Process Clause. Fratta cites a number of cases decided by other courts in this Circuit that found that, in the context of a child abuse investigation, an in-school interview of a child without the parent's consent or presence did not deprive the parent of a right to the custody, care, or management of the child. See Fratta Mem. in Supp. at 21 (citing Guan N. v. NYC Dep't of Educ., No. 11 CIV. 4299 AJN, 2014 WL 1275487, at *25 (S.D.N.Y. Mar. 24, 2014); K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 215–16 (S.D.N.Y. 2013); Phillips v. Cty. of Orange, 894 F. Supp. 2d 345, 375–78 (S.D.N.Y. 2012); Cornigans v. Mark Country Day Sch., No. CV 03-1414 DLI WDW, 2006 WL 3950335, at *6–7 (E.D.N.Y. July 12, 2006); Fowler v. Robinson, No. 94-CV-836, 1996 WL 67994, at *15–16 (N.D.N.Y. Feb. 15, 1996)).

Shakir argues that these cases can be distinguished because they occurred at a school rather than at the police station. See Mem. in Opp. to Fratta at 34–36. At least one case notes a distinction between an in-school interview and one conducted at a police station after the child was removed from school. See Guan, 2014 WL 1275487, at *24–25 (citing Gardiner v. Inc. Vill. of Endicott, 50 F.3d 151, 156 (2d Cir. 1995)). Guan, however, emphasized the child's physical removal from the school, rather than the interview, as the basis of the deprivation. See id. at *24 (stating of Gardiner that "[t]he court and the parties agreed that the child's removal from school triggered her parents' right to due process"); see also Gardiner, 50 F.3d at 156 (discussing only the child's removal from the school, not any questioning or interview). In this case, Fratta did not physically remove A.S., but merely conducted the interview at the police station

where A.S. was already located after being taken there by Stankye.  The court has already determined above that no deprivation of custody occurred when A.S. was removed from Shakir's house and brought to the police station.  Therefore, only the interview itself is at issue here.

While no court in this Circuit has considered an interview at a police station, a change in the location of the interview does not change its effects on the parent's rights.  The court in <u>Phillips</u> reasoned that it had found no authority to support a conclusion that the right to care, custody, and management includes "the parents' right to teach their children not to speak to strangers . . . about their intimate home life and their private parts" or "the parents' right to be present to offer comfort and consolation to their child when being questioned."  <u>Phillips</u>, 894 F. Supp. 2d at 376.  Notably, such analysis focuses on the relationship of the interview to the parents' purported right, rather than on the location of the interview.  Therefore, the court concludes that occurrence of the interview alone, regardless of location, does not raise a genuine issue as to whether Shakir was deprived of a protected liberty interest.  Thus, Fratta is entitled to summary judgment as a matter of law.

Furthermore, even if Fratta's interview did deprive Shakir of his right to the care and management of A.S., Fratta is nonetheless entitled to qualified immunity because the law at the time had not clearly established that an interview alone—held in a location the child was already at—could constitute a deprivation of custody, care, or management that would trigger due process requirements.  "[O]utside of removal or the compulsory provision of medical care, the Second Circuit has not specified what other kinds of government action may violate a parent's protected liberty interest in the care,

custody, and management of his or her child in the child abuse context." Phillips, 894 F. Supp. 2d at 374; see also K.D. ex rel. Duncan, 921 F. Supp. 2d at 215.

District courts in this Circuit have found in-school interviews do not deprive parents of a protected liberty interest, but have not considered whether that holding also applies to interviews conducted in more restrictive locations, such as a police station. These decisions have not been reviewed by the Second Circuit. Therefore, relying only on Supreme Court and Second Circuit precedent, the court cannot say that every reasonable officer at the time[16] would have known that interviewing a child at a police station without parental consent would require procedural due process under the Fourteenth Amendment. Accordingly, Fratta is also entitled to summary judgment for the interview of A.S. on the ground of qualified immunity.

### 4. Release of A.S. to Gandy

Shakir also appears to challenge the defendants' decision to release A.S. into the custody of Gandy while Shakir was being detained. See Mem. in Opp. to Fratta at 17–18; Mem. in Opp. to Stankye at 21. Again, it is undisputed that A.S. was transferred to Gandy's custody after his interview by Fratta, but the parties dispute who was responsible for authorizing Gandy to take custody of A.S. See Stankye L.R. 56(a)1 at 9 ¶ 36; Pl.'s L.R. 56(a)2 at 11 ¶ 36; Fratta L.R. 56(a)1 at 11–12 ¶¶ 48–57; Pl.'s L.R. 56(a)2 at 28–31 ¶¶ 48–57. Stankye and Fratta argue that releasing A.S. to Gandy was appropriate and not a deprivation of Shakir's custody because Gandy was a joint guardian of A.S. with legal rights equal to those of Shakir. See Fratta Mem. in Supp. at

---

[16] Notably, the one case favoring Shakir's reading, in addition to being a district court case, was decided in 2014 and could not have been known to a reasonable official in 2009. See Guan, 2014 WL 1275487, at *25.

22–26; Stankye Mem. in Supp. at 12–13.  The court agrees with Stankye and Fratta that no deprivation of custody occurred and therefore needs not determine whether a genuine issue exists as to who authorized the release of A.S. to Gandy.

Section 45a-606 of the Connecticut General Statutes states, "The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal."  Conn. Gen. Stat. § 45a-606 (2017).  The rights of guardianship include "the obligation of care and control" and "the authority to make major decisions affecting the minor's education and welfare."  Conn. Gen. Stat. § 45a-604 (2017).[17]  In this case, Shakir acknowledges that no court order had been issued altering the equal distribution of parental rights established by section 45a-606.  See Pl.'s L.R. 56(a)2 to Stankye at 13 ¶¶ 43–44.  Although Shakir had filed a petition in Derby Probate Court to remove Gandy as joint guardian and to obtain sole or temporary custody of A.S. on December 31, 2008, the Derby Probate Court had not made a determination in the case by February 6, 2009, when Gandy received custody of A.S. at the police station.  See Pl.'s Aff. (Stankye) at 5 ¶ 21; Pl.'s Aff. (Fratta) at 10; Pl.'s L.R. 56(a)2 to Stankye at 13 ¶ 43; Shakir Dep. Tr. at 30–31.  The probate court hearing did not occur until February 25,

---

[17] At least one Connecticut Appellate Court has identified a distinction between the terms guardian and custodial parent.  See In re Joseph W., Jr., 121 Conn. App. 605, 630 (2010), aff'd, 301 Conn. 245 (2011) ("The court correctly noted that neither our rules of practice nor General Statutes § 46b-129 define the term custody or custodial parent but that our rules of practice and our statutes differentiate between the terms guardian and custody.").  The court in that case found that the custodian was "the parent or person with whom a minor child resides, at all times or from time to time, and who assumes the responsibility for all or part of the day-to-day care and supervision of the child," and that the guardian may not necessarily be a custodial parent.  Id. at 632.  Such distinction was made, however, in the context of determining whether the father qualified as a custodial parent for purposes of his ability to challenge a neglect proceeding.  Id.  The court did not extend the distinction further to indicate that a guardian who was not currently acting as a custodian had diminished parental rights to custody because such a question was not before the court.

2009.[18]  See Fratta and Marotta L.R. 56(a)1 at 20 ¶ 88; Pl.'s L.R. 56(a)2 to Fratta at 41

¶ 88.  Therefore, as of February 6, 2009, Gandy was a joint legal guardian of A.S. with

rights equal to those of Shakir.

Shakir argues to the contrary that Gandy's parental rights were diminished or

eliminated because she had abandoned A.S. when she moved first to Kansas and then

to California.  See Mem. in Opp. to Fratta at 36, 43–44; Mem. in Opp. to Stankye at 21–

23.  To support this argument, he cites section 45a-610 of the Connecticut General

Statutes, which authorizes removal of a parent as guardian for grounds including

abandonment.  See Mem. in Opp. to Fratta and Marotta at 36, 43; Conn. Gen. Stat. §

45a-610(2) (2017).[19]  However, Shakir's reliance on this statute is misplaced because

the statute only authorizes removal of the parent as guardian by the probate court on a

finding of clear and convincing evidence.  See Conn. Gen. Stat. § 45a-610 ("If the Court

of Probate finds that notice has been given or a waiver has been filed, . . . it may

remove a parent as guardian, if the court finds by clear and convincing evidence one of

the following . . . .").  Absent a decision by the probate court, Shakir's arguments for

abandonment do not alter Gandy's status as joint guardian, and therefore he has not

raised a genuine issue of fact indicating that her parental rights were not equal to his.

---

[18] The parties dispute the probate court's determination at the hearing and the statements made by the judge regarding Gandy's custody rights.  See Fratta L.R. 56(a)1 at 20 ¶ 94; Pl.'s L.R. 56(a)2 to Fratta at 42 ¶ 94.  The court discusses whether a genuine issue of material fact has been raised regarding these facts in its later discussion of Shakir's conspiracy claim.  Because this occurred after A.S. was released into Gandy's custody on February 6, 2009, the probate court's conclusion does not affect this court's evaluation of Fratta and Stankye's conduct on that date.

[19] Shakir also cites section 17a-610 of the Connecticut General Statutes, see Mem. in Opp. to Stankye at 21, but the court is unable to identify the source cited, as title 17a of the Connecticut General Statutes does not contain a section 17a-610.  The court therefore assumes that Shakir intended to cite section 45a-610, as he did in his other Memorandum.

Thus, because Gandy was a joint guardian of A.S., Stankye and Fratta did not deprive Shakir of custody by releasing A.S. to Gandy while he was still detained at the police station.  Shakir could not have taken physical custody of A.S. at the time that he was detained, and the transfer did not alter his legal rights, as he had recourse in probate court to ascertain the division of custodial rights with Gandy.  That he was later unsatisfied with the probate court's decision does not change the court's analysis of Stankye and Fratta's conduct.  Indeed, had they refused to release A.S. to Gandy, Stankye and Fratta may have been liable for interfering with her right to custody.  Accordingly, Stankye and Fratta are entitled to summary judgment regarding these actions because no genuine issue of fact exists as to whether they deprived Shakir of a protected liberty interest.

Alternatively, even if Stankye and Fratta did deprive Shakir of custody by releasing A.S. to Gandy, the law was not clearly established at the time that such conduct would constitute a deprivation of custody triggering Shakir's procedural due process rights.  The court is not aware of—nor has Shakir pointed the court to—any Supreme Court or Second Circuit precedent that releasing a child to one parent, who has joint legal custody, deprives the other parent of his or her custodial rights.  At most, the court has identified some district courts in the Ninth Circuit that have considered the question, but these courts do not clearly enunciate a rule, nor can they provide clearly established law for courts in this District for qualified immunity purposes.  See Dees v. Cty. of San Diego, No. 14-CV-189-BEN (DHB), 2016 WL 9488706, at *6–7 (S.D. Cal. May 13, 2016), motion to certify appeal denied, No. 3:14-CV-0189-BEN-DHB, 2016 WL 8673910 (S.D. Cal. Sept. 30, 2016); Rosenbaum v. Washoe Cty., No. 308-CV-418-

ECR-RAM, 2010 WL 745451, at *6 (D. Nev. Feb. 25, 2010), aff'd in part, rev'd in part and remanded, 663 F.3d 1071 (9th Cir. 2011).  Therefore, in the absence of clearly established law, no genuine dispute of fact exists as to the issue of qualified immunity.  Stankye and Fratta are entitled to summary judgment on this ground as a matter of law.

          5.      Conspiracy

Finally, Shakir argues that Stankye and Fratta conspired with Gandy to deprive him of custody of A.S. by facilitating A.S.'s relocation to California with Gandy.  See Mem. in Opp. to Fratta at 52–59; Mem. in Opp. to Stankye at 21.  Among other things, Shakir cites as evidence of the conspiracy the fact that Stankye and Fratta were aware that Gandy planned to take A.S. to California after assuming custody of him.  See Pl.'s Exhibits, Ex. Z at 2; Pl.'s Exhibits, Ex. J at 3, 5.  Shakir also points to evidence that Stankye advised Fratta and Gandy to leave the police department before Browning arrived to avoid an altercation, as well as evidence that Fratta advised Gandy to call the police should Shakir attempt to retake custody of his son.  See Pl.'s Exhibits, Ex. Z at 3–4; Fratta Aff. at 14 ¶¶ 66–67.

First, Stankye and Fratta argue that Shakir has failed to raise a genuine issue of material fact that his due process rights were violated, which precludes a claim of conspiracy.  See Fratta Mem. in Supp. at 30; Stankye Mem. in Supp. at 22–23.  Second, they argue that, even if his rights were violated, Shakir has failed to present evidence raising a genuine issue of material fact that the defendants reached an agreement to violate those rights.  See Fratta Mem. in Supp. at 31–32; Stankye Mem. in Supp. at 24–25.  Finally, Stankye and Fratta argue that they are entitled to qualified immunity because their actions were objectively reasonable under the circumstances.  See Fratta Mem. in Supp. at 35–39; Stankye Mem. in Supp. at 25–28.  The court

agrees that Shakir has not presented evidence raising a genuine issue of material fact that his underlying due process rights were violated. Therefore, the court considers it unnecessary to decide whether he raises a genuine issue as to the existence of an agreement.

A conspiracy claim under section 1983 has three elements: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324–25 (2d Cir. 2002). Additionally, a plaintiff must prove an actual violation of the underlying constitutional right. See Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995). The Second Circuit has held, then, that where the plaintiff's "substantive claims fail on the merits, his civil conspiracy claim must fail as well." Donofrio v. City of New York, 563 Fed. App'x 92, 94 (2d Cir. 2014) (quoting Droz v. McCadden, 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.")).

In this case, the court has already determined that Shakir was not deprived of a protected liberty interest by Stankye's removal of A.S. from his house to the police station, by Fratta's interview of A.S. at the police station, or by their release of A.S. into Gandy's custody. Therefore, the deprivation of custody that he alleges must hinge on Gandy's decision to relocate A.S. to California.

Shakir, however, has pointed the court to no case law indicating that one parent's decision to relocate a child deprives the other parent of a protected liberty interest, such that procedural due process requirements are triggered. In most such instances, the

40

Fourteenth Amendment is not a relevant consideration because such actions are taken by the parent, a private actor, rather than by the state. Therefore, the court has little guidance from precedent in determining whether a child's relocation with the other parent is a deprivation requiring due process when state actors facilitate or assist with the relocation.

In the absence of guidance from Fourteenth Amendment cases, the court finds instructive the existence of state law restrictions on relocation that apply in some instances, but not others.[20] For instance, when a court order has determined the division of custody between two parents and one parent seeks to relocate with the child, the Connecticut General Statutes require the relocating parent to bear the burden of justifying the relocation. See Conn. Gen. Stat. 46b-56d(a) (2017). Such statute, however, is limited to proceedings "before the Superior Court arising after the entry of a judgment awarding custody of a minor child and involving the relocation of either parent with the child, where such relocation would have a significant impact on the existing parenting plan." Id. Additionally, when an action for custody of a minor child is pending before the Connecticut Superior Court, its Rules require entry of an automatic order in an action for custody of a minor child that requires, inter alia, that "[n]either party shall permanently remove the minor child or children from the state of Connecticut, without

---

[20] The court recognizes that state family law is "not the benchmark for evaluating whether or not there has been a federal constitutional violation." See Uwadiegwu v. Dep't of Soc. Servs. of the Cty. of Suffolk, 91 F. Supp. 3d 391, 396 (E.D.N.Y. 2015), aff'd, 639 F. App'x 13 (2d Cir. 2016); see also id. ("A violation of state law does not give rise to a federal civil rights claim."). The court refers to state family law in this instance not to demonstrate that a violation of state law should amount to a constitutional deprivation, but rather to illustrate the extent to which state law has left alone custodial relationships between parents when no court order has issued, which was the case here. As noted previously, no court order had issued, and Shakir's petition before the Derby Probate Court was still pending at the time that Gandy took custody of A.S. at the police station. See Pl.'s L.R. 56(a)2 to Stankye at 13 ¶¶ 43–44; Pl.'s Aff. (Stankye) at 5 ¶ 21; Pl.'s Aff. (Fratta) at 10; Shakir Dep. Tr. at 30–31.

written consent of the other or order of a judicial authority" while the action is pending. Conn. R. Super. Ct. Fam. Sec. 25-5; Conn. R. Super. Ct. Fam. Sec. 25-3.

Neither of these rules applies in Shakir's case. Shakir acknowledges that, at all times relevant to this case, no formal court order existed governing his and Gandy's custodial relationship to A.S. See Shakir Dep. Tr. at 120. Thus, Gandy was not required, pursuant to section 46b-56d, to seek court approval before relocating with A.S. Additionally, the custody proceeding Shakir initiated on December 31, 2008, was in Derby Probate Court rather than a Connecticut Superior Court. See Shakir Aff. (Fratta) at 10; Pl.'s L.R. 56(a)2 to Stankye at 13 ¶ 43 Thus, the automatic order required by Connecticut Superior Court Rules did not apply, nor has Shakir introduced evidence that a similar order was issued by the Derby Probate Court in his case.[21] Notably, then, where neither rule applies, state family law is silent on where a child should live or whether a parent can relocate. Nothing indicates that Gandy was not within her rights as A.S.'s parent and guardian to move him to California. Nor has Shakir alleged that Gandy refused to permit him to see or contact A.S since the relocation.[22] Furthermore, Gandy's relocation with A.S. in no way terminated or altered Shakir's legal rights. Therefore, were he dissatisfied with the relocation, Shakir had legal recourse in state

---

[21] It is worth noting, by way of background, that, absent an agreement by the parties to have a record of the hearing made by the probate court, the decision of a probate court in Connecticut is not a final judgment by a court of record and is subject to de novo review by the Connecticut Superior Court. See Conn. Gen. Stat. § 45a-186(a) (2017); Gardner v. Balboni, 218 Conn. 220, 225 (1991).

[22] Shakir states in his Affidavit that, after his release on bond, he contacted the New Haven Police Department to assist him in retaking custody of his son. See Pl.'s Aff. (Fratta and Marotta) at 39–41. He does not state, however, that he attempted to contact A.S. or Gandy and was not permitted contact. See id. (noting that he drove by Gandy's mother's house, where A.S. was staying, but did not enter). Shakir also states that, since his arrest, he has not spoken to or seen A.S. See id. at 38. However, again, he does not state that he attempted to do so and was refused. Rather, the court notes that his lack of contact with A.S. may at least partially be a result of his current incarceration at Corrigan-Radgowski Correctional Institute.

court to request a court order determining the division of custody and seeking A.S.'s return.  See Conn. Gen. Stat. § 46b-56(a).

Shakir acknowledges that the Derby Probate Court later ruled unfavorably on his application for temporary or sole custody of A.S., thereby affirming Gandy's status as joint legal guardian.  See Stankye L.R. 56(a)1 at 10 ¶¶ 43–44; Pl.'s L.R. 56(a)2 to Stankye at 13 ¶ 43; Shakir Depo Tr. at 30–31, 120.  He claims, however, that the probate judge stated that A.S. should not have been removed from the state without a court order.  See Pl.'s L.R. 56(a)2 to Stankye at 13 ¶ 43; Shakir Depo Tr. at 30–31.  However, Shakir has not presented admissible evidence of this fact.  In his deposition, he states, "my lawyer told me that he [the judge] said it was wrong for my son to be taken out of state without a court order."  Shakir Dep. Tr. at 31; see also Pl.'s Aff. (Fratta) at 48 ¶ 64.g (also claiming that the statements were made by the judge to Shakir's lawyer, not to Shakir).  This statement contains two levels of inadmissible hearsay, however, and therefore cannot be relied upon to create a genuine issue of material fact as to whether Gandy deprived Shakir of custody by removing A.S. from the state.  See Fed. R. Evid. 802; Raskin v. Wyatt Co., 125 F.3d at 66.  Therefore, Shakir has introduced no admissible evidence that the probate court found A.S.'s relocation violative of Shakir's custodial rights.

Finally, the court notes that one court in the Ninth Circuit concluded that a state actor's support of one parent's removal of the children from the other parent was not a violation of the other parent's constitutional rights.  See Dees v. Cty. of San Diego, No. 14-CV-189-BEN (DHB), 2016 WL 9488706, at *6–7 (S.D. Cal. May 13, 2016), motion to certify appeal denied, No. 3:14-CV-0189-BEN-DHB, 2016 WL 8673910 (S.D. Cal. Sept.

30, 2016).  In <u>Dees</u>, the court found "no authority involving the removal of children by one parent from the other" and no "authority stating that a government official who supports one parent's decision to take custody of his children has violated the other parent's constitutional rights."  <u>Id.</u>  While <u>Dees</u> is not binding authority here, this court similarly was unable to find any authority in the Second Circuit indicating that allowing one parent with equal parental rights to take custody of the child would deprive the other parent of a protected liberty interest under the Due Process Clause, even where that transfer resulted in the child's relocation.  Nor has Shakir pointed the court to any such case law.  Thus, even if Stankye and Fratta reached an understanding with Gandy to assist her in taking A.S. to California, those facts do not raise a genuine issue as to whether they conspired to violate Shakir's constitutional rights because Gandy's removal of A.S. did not deprive Shakir of a protected liberty interest.

Additionally, given the lack of precedent in the case law, even if assisting Gandy was a deprivation of custody requiring due process, the law was not clearly established at the time.  Consequently, in the alternative, Stankye and Fratta are entitled to summary judgment on the ground of qualified immunity as to Shakir's conspiracy claim.

In sum, Shakir has not raised a genuine issue of material fact that he was deprived of a protected liberty interest by any of the four actions discussed above. Accordingly, Stankye and Fratta's Motions for Summary Judgment are granted as to both Shakir's procedural due process claims and his federal conspiracy claim. Alternatively, the Motions are also granted on qualified immunity grounds.

C.    <u>Substantive Due Process (Fratta and Stankye)</u>

In addition to his procedural due process claims, Shakir also contends that the same conduct violated his substantive due process rights.  <u>See</u> Mem. in Opp. to Stankye at 30–32; Mem. in Opp. to Fratta at 45–50.

"[I]n order to make out a substantive due process claim, a plaintiff must show a fundamental right protected by the Constitution, a deprivation of that right, and 'arbitrary' and 'outrageous' state conduct that satisfies the 'shocks the conscience' standard." <u>Walker v. City of Waterbury</u>, 601 F. Supp. 2d 420, 424 (D. Conn. 2009), <u>aff'd</u>, 361 F. App'x 163 (2d Cir. 2010).  The first prong identifying a fundamental right is satisfied here because the Second Circuit recognizes that family members have a "substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state."  <u>Cox v. Warwick Valley Cent. Sch. Dist.</u>, 654 F.3d 267, 275 (2d Cir. 2011) (quoting <u>Anthony v. City of New York</u>, 339 F.3d 129, 142 (2d Cir.2003) (internal quotation marks omitted)).  However, under the second prong, "[w]here there is no actual loss of custody, no substantive due process claim can lie." <u>McCaul v. Ardsley Union Free Sch. Dist.</u>, 514 Fed. App'x 1, 3 (2d Cir. 2013) (quoting <u>Cox</u>, 654 F.3d at 276).

In this case, the court has already determined that the evidence introduced by Shakir does not create a genuine issue of fact as to whether Stankye and Fratta deprived Shakir of the custody, care, or management of A.S or conspired with Gandy to do so.  Therefore, Stankye and Fratta are entitled to summary judgment on Shakir's substantive due process claims on the same grounds as his procedural due process claims.  Additionally, in the alternative, they are also entitled to qualified immunity for the same reasons because the law was not clearly established as to whether their conduct

constituted a deprivation of a protected liberty interest. Because summary judgment is appropriate on these two grounds, the court need not address the additional argument of Stankye and Fratta that their actions do not rise to the level of "shocking, arbitrary, and egregious" conduct prohibited by the Due Process Clause. See Fratta Mem. in Supp. at 27–30 (quoting Tenenbaum, 193 F.3d at 600); Stankye Mem. in Supp. at 16–18.

Accordingly, Stankye's and Fratta's Motions for Summary Judgment are granted as to Shakir's substantive due process claims.

D.    Fourth Amendment Unlawful Seizure (Stankye)

The remaining claims and arguments pertain only to defendant Stankye. Shakir alleges that Stankye unlawfully entered and searched his residence and seized A.S. on February 6, 2009. See Am. Compl. at 18–19 ¶ 67. As to the unlawful seizure claim, Stankye argues that Shakir cannot assert his own Fourth Amendment claim based on A.S.'s seizure because Shakir lacks standing. See Stankye Mem. in Supp. at 20–21.

The Fourth Amendment protects individuals against unreasonable searches and seizures. See U.S. Const. amend. IV. It is well established that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969). "When a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes. The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'" Southerland, 680 F.3d at 143. The claim, however, "belongs only to the child, not the parent, although a parent has standing to assert it on the child's behalf." Id.; see also Tenenbaum, 193 F.3d at 601 n.13; Gordon v. City of New York, No. 1:09-CV-04577 (ERK) (MDG), 2016 WL

3976657, at *7 (E.D.N.Y. July 22, 2016); <u>Thomas v. Digglio</u>, No. 15-Civ-3236 (BMC), 2016 WL 7378899, at *10 (E.D.N.Y. Dec. 20, 2016).  While A.S. has standing to bring a Fourth Amendment seizure claim, A.S. is not a plaintiff in this action.  Nor was the action filed by Shakir on A.S.'s behalf.  As such, Shakir lacks standing to bring a claim on his own behalf on the basis of a violation of his son's Fourth Amendment rights.

In response to this argument, Shakir does not dispute that he cannot assert a violation of his own Fourth Amendment rights on the basis of Stankye's seizure of A.S. Instead, he contends that the court should appoint him counsel and permit counsel to add his son as a plaintiff.  <u>See</u> Mem. in Opp. to Stankye at 33–35.  Although Shakir did at one point seek to add his son as a plaintiff, it was not until after the limitations period governing section 1983 actions had elapsed.  <u>See</u> Mot. to Amend (Doc. No. 150).  On March 31, 2016, the court denied his Motion to Amend because Shakir, as a <u>pro se</u> party and non-attorney, could not assert claims in order to vindicate the constitutional rights of his son.  <u>See</u> Ruling Denying Motion to Amend (Doc. No. 175) at 4–5.

Although the court has subsequently appointed counsel for Shakir, <u>see</u> Order Appointing Pro Bono Counsel (Doc. No. 303), the court nonetheless declines to permit him to now amend the Amended Complaint to add A.S. as a plaintiff.  At the time that Shakir first filed the Motion to Amend, the limitations period had already run on any claim that may have been asserted by A.S. regarding his seizure on February 6, 2009, which occurred six years before the Motion was filed.  <u>See</u> <u>Lounsbury v. Jeffries</u>, 25 F.3d 131, 134 (2d Cir. 1994) (holding that the general personal injury statute of limitations set forth in Connecticut General Statutes § 52-577 should be applied to the filing of section 1983 claims arising in Connecticut); Conn. Gen. Stat. § 52-577 (2017)

(setting a three-year limitations period running from "the date of the act or omission complained of"). Additionally, to add a new party and a new count at this stage in the litigation, after parties have completed discovery and briefing for their dispositive pretrial motions, would prejudice the defendants and unduly delay the resolution of this case. Thus, even interpreting Shakir's Memorandum to include a Motion to Amend, the court declines to permit Shakir to add his son as a plaintiff at this stage of the litigation.

Shakir also attempts to assert two new unlawful seizure claims: first, that entering the residence forcefully with guns drawn and a battering ram is itself a seizure, and second, that Stankye seized Rasheed by threatening him and overcoming his will. See Mem. in Opp. to Stankye at 35–36. Neither claim was asserted in the Amended Complaint, however, so the court need not consider them now. See Thomas v. Egan, 1 Fed. App'x 52, 54 (2d Cir. 2001) ("A claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim. Thus, it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." (citations omitted)); Davis v. Conn. Cmty. Bank, N.A., 937 F. Supp. 2d 217, 238 (D. Conn. 2013) (declining to consider claims advanced by the plaintiffs "for the first time in opposition to the [defendant's] motion for summary judgment"). Nor does Shakir have standing to assert a claim on Rasheed's behalf, for the same reasons that he cannot assert a claim on behalf of A.S. See T.P., 2012 WL 860367, at *3.

Therefore, because Shakir does not have standing, Stankye's Motion is granted as to Shakir's Fourth Amendment unlawful seizure claim.

E.    Fourth Amendment Unlawful Search (Stankye)

Shakir also contends that Stankye violated his Fourth Amendment rights by entering and searching his home without a warrant. See Am. Compl. at 18–19 ¶ 67.

48

Stankye argues that Shakir failed to raise a genuine issue of material fact challenging Stankye's claim that exigent circumstances obviated the need for a search warrant. See Stankye Mem. in Supp. at 18–20.  In the alternative, he argues that, even if the court concludes that a genuine issue of fact exists as to whether Shakir's Fourth Amendment rights were violated by the search, Stankye is protected by qualified immunity because the search was objectively reasonable.  See id. at 25–28.

"The warrant requirement of the Fourth Amendment guarantees the fundamental right to be free from government intrusion into the privacy of one's home."  United States v. MacDonald, 916 F.2d 766, 769 (2d Cir.1990).  Thus, it is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation marks and citations omitted).  The Supreme Court recognizes certain exceptions to the warrant requirement.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (internal quotation marks and citations omitted)).  One exception applies when "'the exigencies of the situation' . . . make the needs of law enforcement so compelling that the warrantless search is objectively reasonable."  Michigan v. Fischer, 558 U.S. 45, 47 (2009) (quoting Mincey v. Arizona, 437 U.S. 385, 393–94 (1978)).  Under the exigent circumstances exception, "law enforcement officers may enter a home without a warrant to render emergency aid to an injured occupant or to protect an occupant from imminent injury."  Brigham City, 547 U.S. at 403 (citation omitted).

A district court must consider "the totality of the circumstances" with regard to the specific case in determining whether an emergency existed that justified the law enforcement officer's warrantless entry or search of a home.  See Missouri v. McNeely, 569 U.S. 141, 151 (2013).  A law enforcement officer "bear[s] a heavy burden . . . when attempting to demonstrate an urgent need that might justify warrantless searches or arrestes." Kentucky v. King, 563 U.S. 452, 474 (2011) (quoting Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984)).  "The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an 'urgent need to render aid or take action.'" United States v. Klump, 536 F.3d 113, 117–18 (2d Cir. 2008) (citations omitted).  Thus, the officer must demonstrate that his conduct was objectively reasonable.  "The officer's subjective motivation is irrelevant." Brigham City, 547 U.S. at 404.

It is undisputed that Stankye entered and searched Shakir's residence without a warrant on February 6, 2009.  See Stankye L.R. 56(a)2 at 7 ¶ 30; Stankye Mem. in Supp. at 18; Pl.'s Exhibits, Ex. B2 at 2.  Stankye contends that exigent circumstances justified the warrantless entry and search because he had a reasonable belief that A.S. would either be at risk of imminent harm or left without proper care and supervision after Shakir's arrest and removal.  See Stankye Mem. in Supp. at 18–20.  Stankye states the following in justifying his decision to enter the residence to search for A.S.: "Because police had been unable to confirm the whereabouts and well-being of plaintiff's son, the decision was made to demand entry into plaintiff's residence to search for him in light of: (a) the nature of the charges for which plaintiff was being arrested; (b) the fact that plaintiff's son had not yet undergone a forensic interview; (c) plaintiff's prior felony

conviction for the sale of narcotics; (d) plaintiff's refusal to tell police where his son was; and (e) the fact that plaintiff would be unable to supervise or care for his son while in police custody." See Stankye L.R. 56(a)1 at 7–8 ¶ 30.

Some courts have recognized exigent circumstances where a child was left alone in the home without care or supervision. See United States v. Bradley, 321 F.3d 1212, 1215 (9th Cir. 2003) ("The possibility of a nine-year-old child in a house in the middle of the night without the supervision of a responsible adult is a situation requiring immediate police assistance."); Callahan v. City of New York, 90 F. Supp. 3d 60, 70 (E.D.N.Y. 2015) (holding, where plaintiff's "children had been 'left bereft of care and supervision' for almost three hours by the time the officers arrived," that the "harm of being left alone" was "sufficient to create an exigent circumstance"); United States v. Reid, No. 4:11-CR-499 JCH/DDN, 2012 WL 628910, at *6 (E.D. Mo. Feb. 7, 2012), report and recommendation adopted, No. 4:11CR499 JCH DDN, 2012 WL 628907 (E.D. Mo. Feb. 27, 2012), aff'd, 769 F.3d 990 (8th Cir. 2014) ("Because the deputies intended to transport Graham in custody from the residence, they reasonably believed that they should not leave Graham's minor children unattended at the residence for an indefinite amount of time. The deputies' concern for the welfare of Graham's unattended minor children gave them sufficient grounds to enter the residence in search of the children.").

Other courts have held that exigent circumstances require more than the mere fact that a child is at home unattended, such as some additional indication of danger. See Ford v. D.C., No. CV 13-1960 (RMC), 2016 WL 4379038, at *4 (D.D.C. Aug. 16, 2016), appeal dismissed, 690 F. App'x 7 (D.C. Cir. 2017) (finding no exigent circumstances when officers heard a baby crying inside the residence because "[i]t is

well-established that exigent circumstances justify a warrantless entry only when there is need for immediate aid, not when there is a mere possibility of danger" (internal quotation marks and citations omitted)); United States v. Gillespie, 332 F. Supp. 2d 923, 931 (W.D. Va. 2004) ("Concern for the welfare of children should only rise to an exigency if the police are reasonably certain that children have been abandoned in a home, and have a reasonable belief that they are in some kind of danger.  A mere belief that young children could be home alone should not be enough to overcome a person's Fourth Amendment protection against warrantless searches.").

In this case, however, even assuming that the court agrees with the first set of cases that an unattended child in the residence rises to the level of exigency, summary judgment is nonetheless inappropriate because a genuine dispute exists as to whether Stankye had a reasonable belief that A.S. was left alone in the home at the time.

It is undisputed that, at some time after Stankye and the other officers knocked on his door, Shakir emerged from the residence and was placed under arrest.  See Stankye L.R. 56(a)1 at 7 ¶ 27; Pl.'s L.R. 56(a)2 to Stankye at 7–8 ¶ 27; Pl.'s Aff. (Stankye) at 11 ¶ 44.  It is also undisputed that Stankye asked Shakir at least twice about the whereabouts of A.S., and Shakir did not provide him with that information.  See Stankye L.R. 56(a)1 at 7 ¶ 28; Pl.'s L.R. 56(a)2 to Stankye at 8 ¶ 28; Pl.'s Aff. (Stankye) at 11–12 ¶¶ 47–48.  Both parties also agree that Stankye was informed earlier in the day that A.S. was not in school.[23]  See Stankye L.R. 56(a)1 at 5 ¶¶ 18–19;

---

[23] The parties disagree as to whether Stankye knew that the reason A.S. was not in school was because Shakir had taken A.S. to a doctor's appointment.  See Stankye L.R. 56(a)1 at 5 ¶¶ 18–19; Pl.'s L.R. 56(a)2 to Stankye at 6 ¶¶ 18–19.  For example, Shakir provides the Affidavit of Nancy Lee Dishereits, the acting manager of Bob Thomas Ford Dealership where Shakir works, who avers that she informed Stankye that Shakir "would not be in to work until later that day because he had to take his son to a doctor's appointment."  Pl.'s Exhibits, Ex. K11 at 1.  Thus, a genuine issue exists as to whether

Pl.'s L.R. 56(a)2 to Stankye at 6 ¶¶ 18–19.  However, the court concludes that a

genuine issue of material fact exists as to whether Stankye had confirmed that A.S. was

not with Browning prior to entering the residence.[24]

Stankye avers that, an hour prior to executing the arrest warrant on Shakir, he

called Browning to inquire about A.S.'s whereabouts.  See Stankye Aff. at 4 ¶¶ 16–17.

According to Stankye, Browning informed him that A.S. was with her, so Stankye

directed her to bring A.S. to Shakir's residence, where Stankye was already waiting, "so

that police could ensure his [A.S.'s] safety and well-being."  Id. at 4 ¶ 17.  Stankye's L.R.

_____

Stankye was aware of the doctor's appointment, but the court considers this fact only of minimal relevance to the question of exigent circumstances because, in either case, it is A.S.'s absence from school that contributes to Stankye's concern about his whereabouts.

[24] Shakir also argues that another genuine dispute exists as to whether Stankye was aware at the time that the adult male in the house was Shakir's brother, but the court concludes that there is no genuine dispute as to this fact because the evidence Shakir relies on to raise this issue would not be admissible at trial.  See Stankye L.R. 56(a)1 at 8 ¶ 31; Pl.'s L.R. 56(a)2 to Stankye at 10 ¶ 31.  Stankye states in his Affidavit that the male who opened the door was "unknown to [him]."  Stankye Aff. at 5 ¶ 22.  Shakir asserts to the contrary in his own Affidavit that Stankye knew that the man was Shakir's brother.  See Pl.'s Aff. (Stankye) at 12 ¶ 52.  To support this statement, Shakir claims that DCF workers, including Fratta, had participated in multidisciplinary meetings with Rasheed and had then shared that information with Stankye.  See id.  He further claims that Gandy had told him that she had informed Stankye that Shakir's brother lived with Shakir and A.S.  See id.  Finally, Shakir cites to his own deposition, in which he stated that, while he had not informed Stankye that the man inside his residence was his brother, Rasheed told Shakir that Rasheed had done so when the officers entered the house.  See id.; Shakir Dep. Tr. at 82.

The court agrees with Stankye, however, that the evidence Shakir cites would be inadmissible.  See Stankye Reply in Supp. at 4 n.2.  As to Shakir's first claim that Fratta informed Stankye of Rasheed's identity because they generally share information at multidisciplinary meetings, Shakir lacks personal knowledge to testify to that exchange because he does not claim that he was present at those meetings.  See Fed. R. Evid. 602.  As to the statements made to Shakir by Gandy and Rasheed, such statements are inadmissible hearsay not subject to any exception.  See Fed. R. Evid. 802.  The underlying statements made by Gandy and Rasheed to Stankye are not hearsay because they are offered not for the truth of the matter asserted, but for the effect on the listener, i.e. to prove that Stankye was on notice as to Rasheed's identity.  See Fed. R. Evid. 801(c)(2).  However, the statements made by Gandy and Rasheed to Shakir, informing him of their prior statements to Stankye, are offered for the truth of the matter and therefore are inadmissible hearsay.  Shakir offers no evidence from Gandy or his brother directly that such statements were made.  See Pl.'s Exhibits, Ex. V; Pl.'s Exhibits, Ex. W.   Therefore, Shakir has presented no admissible evidence to raise a genuine issue as to whether Stankye was aware of the identity of Shakir's brother at the time of the search.  See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

56(a)1 Statement of Facts then alleges that "he subsequently learned that plaintiff's son was not in fact with plaintiff's mother." Stankye L.R. 56(a)1 at 6–7 ¶ 26. However, in his Affidavit, Stankye does not state that he learned that A.S. was not with Browning; rather, he states merely that he was "unable to confirm the whereabouts and well-being of plaintiff's son," presumably because Browning had not brought A.S. to the residence as Stankye had requested. Stankye Aff. at 5 ¶ 21. Stankye also cites Fratta's Affidavit, which states, "[A.S.'s] grandmother reported to Detective Stankye that [A.S.] was shopping with his aunt, but Detective Stankye later learned that this was not true." Fratta Aff. at 10 ¶ 42.f.

Shakir admits that he has no knowledge that this call occurred or what was said over the call. See Pl.'s Aff. (Stankye) at 11 ¶ 41; Pl.'s L.R. 56(a)2 to Stankye at 7 ¶ 26. However, Stankye's own Affidavit creates a genuine issue of material fact as to whether Stankye knew that A.S. was not with Browning before he entered the home or whether he was merely unable to confirm that he was. The distinction is significant because there may have been other reasonable explanations for Browning's failure to bring A.S. to the residence other than that A.S. was not with her. Such issue is relevant because it bears on the reasonableness of Stankye's belief that A.S. was alone in the home.[25]

Reading the facts in the light most favorable to Shakir, then, a reasonable juror could determine that the circumstances did not rise to the level of exigency needed to

---

[25] Although A.S. was in fact in the residence, the court's inquiry considers the perspective of a reasonable law enforcement officer on the scene at the time without the benefit of hindsight. See P.A. v. City of New York, 44 F. Supp. 3d 287, 300–01 (E.D.N.Y. 2014) ("[I]n determining whether emergency circumstances existed, the facts must not be viewed in hindsight. Rather, the question is whether the officer had a reasonable basis for concluding at the time of removal that it was necessary based on emergency circumstances.").

justify a warrantless search.[26]  See Gary Friedrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 312 (2d Cir. 2013) (requiring the court to "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor").  Thus, summary judgment is inappropriate.

Nor can the court award Stankye summary judgment on the ground of qualified immunity.  Stankye argues that, even if the court concludes that a genuine issue of fact exists as to whether there were exigent circumstances, he is entitled to qualified immunity because it was objectively reasonable for him to believe that such circumstances existed.[27]  See Stankye Mem. in Supp. at 27–28; Taravella, 599 F.3d at 134.

However, the same issues of fact that preclude summary judgment on Stankye's argument for exigent circumstances also prevent the court from awarding summary judgment on the ground of qualified immunity.  Where reasonableness depends on the

---

[26] This is particularly true in the absence of additional factors indicating a dangerous situation within the home.  For example, the search occurred at "mid-day" rather than in the middle of the night.  See Pl.'s Exhibits, Ex. W at 38; cf. Bradley, 321 F.3d at 1215 (finding exigent circumstances where a child was without supervision "in the middle of the night").  Nor does Stankye aver that there were any signs of criminal activity occurring within the residence.  Cf. United States v. Martins, 413 F.3d 139, 147–48 (1st Cir. 2005) (finding exigent circumstances where the child indicated that he was home alone in an apartment filled with thick marijuana smoke).  Finally, the court considers Stankye's reliance on factors such as the nature of the charges against Shakir and his past conviction for a narcotics violation to be of diminished significance.  Stankye admits Shakir had been already removed from the home, arrested, and placed in the police cruiser at the time that Stankye entered the home.  See Stankye Aff. at 5 ¶ 19.  Therefore, Shakir no longer posed an immediate danger to A.S. even if A.S. remained in the residence.  See Gates v. Texas Dep't of Protective & Regulatory Servs., 537 F.3d 404, 422–23 (5th Cir. 2008) (finding "no immediate danger to the children" where the alleged abusive parent was not at home).  Additionally, despite the allegations, it is undisputed that Fratta found, in a prior interview with Shakir and A.S., neither evidence of abuse or inappropriate behavior by Shakir towards his son nor indications of "violations or unsafe conditions" in the home.  See Stankye L.R. 56(a)1 at ¶ 8; id., Ex. C at 1; Pl.'s L.R. 56(a)2 to Stankye at 4 ¶ 8.

[27] Stankye does not raise an argument via the first means of establishing qualified immunity; that is, he does not challenge whether Shakir's right was clearly established or not.  See Stankye Mem. in Supp. at 25–28.

facts of the situation, and one version of the disputed facts could demonstrate an objectively unreasonable search, summary judgment on qualified immunity is inappropriate.  See Maye v. Vargas, 638 F. Supp. 2d 256, 262 (D. Conn. 2009) ("Although qualified immunity is a question of law, because issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted.  Therefore, if there are disputed facts such that one version of the facts could demonstrate unreasonable force by the police, it is not appropriate to find qualified immunity on a summary judgment motion." (citations omitted)); see also Southerland, 680 F.3d at 151; Cooke-Harris v. Delgado, No. 05 CIV. 2081 (RMB), 2007 WL 3256122, at *4 (S.D.N.Y. Oct. 30, 2007) ("The existence of material factual disputes relating to the legality of the entry, arrests, and force applied 'preclude[] a meaningful resolution of the qualified immunity defense at the summary judgment stage.'" (quoting Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003)).  The court is not prepared to conclude that, viewing the evidence in the light most favorable to Shakir, no reasonable jury could find that the search was objectively unreasonable.  See Obert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) ("Summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant show[s] that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." (internal quotation marks and citations omitted)).

Therefore, Stankye's Motion for Summary Judgment is denied as to Shakir's Fourth Amendment claim of unreasonable search.

Shakir claims that Stankye subjected him to excessive force and unconstitutional conditions of confinement at the DPD in violation of his Eighth Amendment rights.  See Am. Compl. at 14 ¶ 54.  Stankye argues that the Eighth Amendment does not apply to Shakir's pre-conviction claims.  See Stankye Mem. in Supp. at 21–22.

The Eighth Amendment protection against cruel and unusual punishments applies only after conviction.  See Whitley v. Albers, 475 U.S. 312, 318 (1986).  Shakir's allegations regarding conditions at the DPD pertain to conduct that occurred in connection with his arrest on criminal charges on February 6, 2009, at which time he had not yet been convicted of any crime.  Thus, the Eighth Amendment affords Shakir no protection.  Stankye's Motion for Summary Judgment is granted as to all claims that Stankye violated Shakir's Eighth Amendment rights.

Although Shakir incorrectly raises his claims under the Eighth Amendment, the court nevertheless construes Shakir's claims liberally as having been asserted under the correct legal standard.[28]  A claim of excessive force occurring during an arrest is analyzed under the Fourth Amendment, see Graham v. Connor, 490 U.S. 386, 394–95 (1989), while a claim challenging conditions of confinement during pretrial detention is analyzed under the Due Process Clause of the Fourteenth Amendment, see id. at 395 n.10.  The Supreme Court has not yet resolved, however, where the line between arrest and pretrial detention is drawn.  See Graham, 490 U.S. at 395 n.10; Perez v. City of New York, No. 07 Civ. 10319 (RJS), 2009 WL 1616374, at *7 (S.D.N.Y. June 8, 2009).

---

[28] The court must interpret a pro se party's briefings liberally and interpret them "to raise the strongest arguments that they suggest."  Willey v. Kirkpatrick, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citations omitted).

Courts in this Circuit, however, have analyzed claims of excessive force occurring after arrest but before arraignment under the Fourth Amendment standard. *See* Powell v. Gardner, 891 F.2d 1039, 1044 (2d Cir. 1989) ("We think the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer."); Bryant v. Meriden Police Dep't, No. 3:13-CV-449 (SRU), 2017 WL 1217090, at *6 (D. Conn. Mar. 31, 2017); Quint v. Dunaj, No. 3:02CV2053 (AVC) (TPS), 2006 WL 167563, at *6 (D. Conn. Jan. 20, 2006) (dividing "the continuum from arrest through incarceration . . . into three sections with different constitutional provisions governing claims arising in each section: the period of arrest and custody prior to arraignment is governed by the Fourth Amendment; the pretrial detention period between arraignment and conviction is governed by the Due Process Clause of the Fourteenth Amendment; and the time after conviction is governed by the Eighth Amendment").[29]

---

[29] In reasoning that the Fourth Amendment should apply, some courts in this Circuit have employed language that emphasizes the time at which a judicial officer reviews the plaintiff's detention for probable cause. See Lewis v. Clarkstown Police Dep't, No. 11 CIV. 2487 ER, 2014 WL 6883468, at *7 (S.D.N.Y. Dec. 8, 2014) ("The reasoning present in decisions applying the Fourth Amendment to pre-arraignment medical care claims is consistent with the Second Circuit's approach to pre-arraignment excessive force claims. It is also in line with the Supreme Court's observation that a pretrial detainee is someone who has had a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" (quoting Bell v. Wolfish, 441 U.S. 520, 536 (1979)); Perez, 2009 WL 1616374, at *7 (citing the Ninth and Tenth Circuits as "similarly 'persuaded' that the Fourth Amendment governs claims relating to the 'treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for [the] arrest"). Such language could be read to imply that pre-arraignment detention after an arrest executed pursuant to a warrant may be treated differently than after a warrantless arrest because, in the former case, a judge has determined that probable cause exists.

While the court recognizes the logic behind this distinction, it also recognizes the differences between arraignment and a probable cause hearing and declines to expand the Powell reasoning without an indication from the Circuit that such an expansion would be appropriate. The majority of the cases in this District interpreting Powell have drawn the line at arraignment or the setting of bail. See Bryant, 2017 WL 1217090, at *6 ("Courts within the circuit generally apply the Fourth Amendment to all claims of excessive force prior to the individual being arraigned or formally charged."); Quint, 2006 WL 167563, at

In Shakir's case, a genuine issue of material fact exists as to whether arraignment had occurred at the time that the alleged constitutional violation occurred, when Shakir was made to strip and the air conditioner was turned on in the holding cell. Neither party's Statement of Facts or Affidavit addresses when exactly Shakir's arraignment occurred. Shakir's Affidavit avers that Stankye took part in requesting a bond of $150,000. See Pl.'s Aff. (Stankye) at 14 ¶ 66. Shakir situates this fact after the paragraph in which he states that Stankye made him strip and before the paragraph in which he states that Stankye turned on the air conditioning. See id. at 14 ¶¶ 65, 67. However, it is not clear that the paragraphs in his Affidavit are organized chronologically. For example, Shakir states that Stankye taunted him about his $150,000 bond in an earlier paragraph before he states that Stankye participated in requesting that bond. See id. at 14 ¶¶ 64, 66. Additionally, he states that Stankye "turned the A/C on max, when he knew he just took my clothes," implying a proximity in time between the two actions. See id. at ¶ 67. Stankye's Affidavit also does not mention the timing of the arraignment because he avers that he did not do Shakir's booking, participate in setting his bail, or otherwise interact with him at the police station on February 6, 2009. See Stankye Aff. at ¶¶ 28–29. Both parties do agree that Shakir

---

*6 (stating that "the period of arrest and custody prior to arraignment is governed by the Fourth Amendment"); Thompson v. City of Meriden, No. 3:94-CV-1950 (EBB), 1999 WL 301693, at *5 (D. Conn. Apr. 14, 1999) ("At least two courts in the Second Circuit have interpreted Powell and Rodriguez to require application of the Fourth Amendment at least until plaintiff's pretrial custody status is ordered by a judicial officer, as upon arraignment resulting in an order for pretrial regulatory detention or the setting of bail conditions."). Additionally, the undersigned has previously applied the Fourth Amendment standard to a claim of pre-arraignment use of excessive force where the defendant was arrested pursuant to an arrest warrant. See Henderson v. Williams, No. 3:10-CV-1621 (JCH), 2013 WL 1984545, at *2, 4 (D. Conn. May 13, 2013). In line with these cases, the court likewise considers the line to be whether Shakir has been arraigned or formally charged, not whether a probable cause determination has been made.

was then released on bond later that evening.  See Pl.'s Aff. (Stankye) at 16 ¶ 74;

Stankye Mem. in Supp. at 22.

Based on the facts in the record, then, the court cannot determine whether the

alleged conduct occurred before or after Shakir's arraignment.  Because the court must

"construe the evidence in the light most favorable to the non-moving party and . . . draw

all reasonable inferences in its favor," Gary Friedrich Enters., 716 F.3d at 312, the court

concludes, for the purpose of determining the legal standard applicable on this Motion

for Summary Judgment, that the incomplete evidence could be read to indicate that the

conduct in question occurred prior to arraignment.[30]

A second issue exists, however, as to whether the type of claim should affect the

legal standard appropriately applied.  Shakir's claim is more accurately described as

alleging unconstitutional conditions of confinement while he was held at the DPD, rather

than as alleging use of excessive force by Stankye.   The crux of his claim is that he

was stripped of his clothing and left in the holding cell, which Stankye had caused to

become freezing cold.[31]  The Circuit, however, has not opined on whether the language

in Powell extends to pre-arraignment claims challenging conditions of confinement in

addition to excessive force claims.  In the somewhat related context of claims asserting

---

[30] If the facts at trial indicate otherwise, i.e. that Shakir had already been arraigned when the alleged conduct occurred, the court would apply the Fourteenth Amendment standard at that stage.

[31] Although Shakir also claims that Stankye verbally taunted him about his excessive bail, these allegations are unlikely to establish a constitutional violation on their own.  The Second Circuit has held that verbal harassment does not state a claim of constitutional violation under section 1983 without further allegation of a specific injury.  See Johnson v. Eggersdorf, 8 Fed. App'x 140, 143 (2d Cir. 2001) ("In this Circuit, allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged."); Gibson v. Travaglin, 164 F.3d 617 (Table), at *2 (2d Cir. 1998) ("[V]erbal harassment and name-calling, absent 'appreciable injury,' are not constitutional violations cognizable under Section 1983." (quoting Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986) (per curiam))).  Therefore, the court focuses its analysis on Shakir's remaining allegations that he was made to strip and left with one thin layer of clothing in a cold holding cell.

denial of medical care, district courts in this Circuit are split. Compare Goodwin v. Kennedy, No. CV 13-1774 SJF AKT, 2015 WL 1040663, at *7 (E.D.N.Y. Mar. 10, 2015) (asserting that courts in the Eastern District of New York "generally apply the 'deliberate indifference' standard of the Due Process Clause of the Fourteenth Amendment . . . to claims that law enforcement officials denied medical treatment to arrestees held in state custody"); with Lewis v. Clarkstown Police Dep't, No. 11 CIV. 2487 ER, 2014 WL 6883468, at *5 (S.D.N.Y. Dec. 8, 2014) (applying the Fourth Amendment standard to the plaintiff's claim for denial of medical treatment while he was an arrestee).

Courts applying the Fourth Amendment standard to denial of medical care have reasoned that the type of claim should not be determinative because the rationale for applying the Fourth Amendment—that police should be held to an objective standard of reasonableness before a judicial officer has determined the defendant's custody status—holds true regardless of the type of claim. See Freece v. Young, 756 F. Supp. 699, 703 (W.D.N.Y. 1991) ("There is no reason, given the Court's current functional approach to these matters, to hold that a plaintiff was an arrestee governed by the Fourth Amendment for certain types of claims such as excessive force and not an arrestee for other claims such as denial of needed medical treatment immediately after the events concerning the excessive force occurred."); see also Lewis, 2014 WL 6883468, at *5 ("The courts that have applied the Fourteenth Amendment noticeably did not grapple with the question of which standard to apply. In contrast, those that have squarely confronted the issue have determined that the Fourth Amendment provides the proper framework and the Court finds their reasoning persuasive."). The court finds this

reasoning persuasive and notes that at least one other court in this District has as well. See Quint, 2006 WL 167563, at *6.

Courts applying the Fourteenth Amendment standard to pre-arraignment denial of medical treatment claims have based their contrary determination on Second Circuit precedents applying the Fourteenth Amendment's Due Process Clause to denial of medical care claims for pretrial arrestees. See Goodwin, 2015 WL 1040663, at *9 (citing Weyant v. Okst, 101 F.3d 845, 856–57 (2d Cir.1996); Mills v. Fenger, 216 Fed. App'x 7, 10 (2d Cir. 2006)). However, these two Second Circuit cases did so without expressly considering which standard should apply to pre-arraignment, as opposed to pretrial, denial of medical treatment. See Lewis, 2014 WL 6883468, at *6 (finding that Weyant and Mills did not address the issue because "in neither of these cases did the Second Circuit explain why it applied the Due Process clause instead of the Fourth Amendment, apparently overlooking the latent inconsistency that is implicated in this case").[32] Although the cases occurred after Powell, neither case addressed the line drawn by Powell at arraignment. The cases focused instead on the line between pretrial arrestees/detainees, governed by the Fourteenth Amendment, and convicted prisoners, governed by the Eighth Amendment. See Weyant, 101 F.3d at 856–57; Mills, 216 Fed. App'x at 10. Given the lack of clear direction from the Circuit in these cases, the court follows instead the line drawn by the Circuit in Powell and applies the Fourth Amendment to Shakir's claim regarding his conditions of pre-arraignment confinement.

---

[32] Lewis further points out that Weyant cites a 1983 Supreme Court decision, City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983), to support its conclusion that the Due Process Clause applies to a pretrial detainee. See Lewis, 2014 WL 6883468, at *6. Lewis notes that City of Revere "preceded the Supreme Court's holding in Graham, which at least suggested that the Fourth Amendment is applicable to excessive force claims brought by arrestees." Id. Therefore, Weyant relies on precedent that does not account for the distinction between pre-arraignment and pretrial detainees.

To establish a Fourth Amendment claim, the plaintiff must show that the conduct of the officer was "objectively unreasonable." <u>Graham</u>, 490 U.S. at 397. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interest' against the countervailing governmental interests at stake." <u>Id.</u> at 396. Factors that courts should consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> The reasonableness inquiry is objective and does not concern the officer's subjective motivations. <u>Id.</u> at 397; <u>see also</u> <u>Thompson</u>, 1999 WL 301693, at *6.

The Amended Complaint includes a conclusory allegation that Stankye used excessive force against Shakir. <u>See</u> Am. Compl. at 14 ¶ 54. In response to the Motion for Summary Judgment, however, Shakir does not argue that Stankye used force against him or physically injured him in any way. <u>See</u> Mem. in Opp. to Stankye at 37–39. Rather, at his deposition, Shakir conceded that Stankye did not subject him to physical force in connection with or after his arrest on February 6, 2009. <u>See</u> Shakir Dep. Tr. at 101. Instead, he argues that his rights were violated by Stankye's conduct during his detention at the DPD after his arrest. <u>See</u> Mem. in Opp. to Stankye at 37–39. Shakir alleges that Stankye ordered him to strip down to one layer of clothing, taunted him, placed him in a holding cell, and turned up the air conditioning. <u>See</u> Am. Compl. at 13 ¶ 52, at 15 ¶ 56; Shakir Dep. Tr. at 89–90; Pl.'s Aff. (Stankye) at 14–15 ¶¶ 63–68. Shakir alleges that he became sick as a result of the cold temperatures in his cell. <u>See</u> Am. Compl. at 13 ¶ 52., Pl.'s Aff. (Stankye) at 14 ¶ 67.

Shakir has presented sufficient admissible evidence to raise a genuine issue of material fact as to whether Stankye made him strip down to one layer of clothing, but not as to whether Stankye turned on the air conditioning. Stankye avers in his Affidavit that he did not "transport plaintiff from his residence to the DPD," "play any role in his booking and processing on February 6, 2009," or "have any contact with plaintiff at the DPD on February 6, 2009." See Stankye Aff. at 6 ¶¶ 28–29. Shakir offers evidence in part to the contrary in his own Affidavit. He states that, after being taken to the holding area at the DPD, Stankye made him strip of his clothing down to his underwear and took his clothing away from him. See Pl.'s Aff. (Stankye) at 14 ¶¶ 63, 65. Shakir then avers that he was left in his cell without his clothes when the air conditioning was turned on. See Pl.'s Aff. (Stankye) at 14 ¶ 67; Shakir Dep. Tr. at 86. Thus, Shakir's Affidavit and deposition transcript are sufficient to raise a genuine issue as to whether Stankye caused him to strip down to his underwear and left him in the holding cell without his clothing.

As to Stankye's responsibility for causing the cold temperature in Shakir's cell, however, the court concludes that there is no genuine factual dispute. Stankye states in his Affidavit that he did not adjust the air-conditioning on that date, did not know how to do so, did not order anyone else to do so, and did not have any knowledge that anyone had done so. See Stankye Aff. at 6 ¶ 30. Shakir presents no admissible evidence that contradicts these facts. Rather, his deposition testimony asserts merely that he knew the air conditioner had been turned on because he could feel the change in temperature and hear the sound of the air conditioner working. See Shakir Dep. Tr. at 90–91. He testified that he did not see Stankye or anyone else actually turn on the air conditioner.

See id. at 90.  In his Affidavit, Shakir claims to know that Stankye turned on the air conditioner, see Pl.'s Aff. (Stankye) at 14 ¶ 67, but he lacks personal knowledge to testify to that fact.  Instead, his deposition testimony reveals that his basis for that alleged knowledge is merely an inference drawn from Stankye's prior conduct toward him, which Shakir's describes as "vulgar."  See Shakir Dep. Tr. at 89–90.  He similarly attempts to reason from the fact that Stankye gave orders to the officers at his residence earlier that day that Stankye was also in charge of his cell conditions at the DPD.  See Pl.'s L.R. 56(a)1 to Stankye at 12 ¶ 39.

The court concludes that Shakir's inference is unsupported because other officers were also present at the station and could have been responsible for the change in temperature.  See Pl.'s Aff. (Stankye) at 14–15 ¶ 68; Mem. in Opp. to Stankye at 38.  Nor does the court believe that a detective's authority over the execution of an arrest warrant necessarily translates to authority over the conditions of holding cells at the police station.  Combining this with Shakir's lack of personal knowledge, the court concludes that Shakir has not presented sufficient evidence to raise a genuine issue of fact as to whether Stankye was responsible for air conditioning in Shakir's cell.  Accordingly, the court considers Shakir's Fourth Amendment claim solely on his allegation that Stankye required him to strip and left him in his cell without clothing in the winter time.

Courts in this Circuit have held, under the Eighth or Fourteenth Amendment standard, that requiring a detainee to strip and endure a "prolonged period" of cold is an unconstitutional condition of confinement, but that temporary deprivation of clothing and exposure to cold is not.  Compare Wright v. McMann, 387 F.2d 519, 526 (2d Cir. 1967)

(holding under the Eighth Amendment that "civilized standards of humane decency simply do not permit a man for a substantial period of time to be denuded and exposed to the bitter cold of winter in northern New York State"); with Woods v. Miller, No. 9:14-387 F.2d 519-0996 (TJM/DJS), 2017 WL 4181383, at *4 (N.D.N.Y. Aug. 1, 2017) ("In cases where an inmate was not subjected to 'bitter cold' for a 'prolonged period,' however, the Second Circuit has held that an Eighth Amendment claim is not properly established." (citing Trammel v. Keane, 338 F.3d 155, 164–65 (2d Cir. 2003)); Silber v. Pallito, No. 1:09-CV-73, 2011 WL 1225594, at *9 (D. Vt. Feb. 7, 2011), report and recommendation adopted as modified, No. 1:09-CV-00073-JGM, 2011 WL 1225588 (D. Vt. Mar. 31, 2011) ("The duration of the exposure appears to be significant.").

However, the Fourth Amendment standard of objective reasonableness differs from the Eighth and Fourteenth Amendment standards.  The Fourth Amendment inquiry is objective and does not look to the officer's mental state.  See Graham, 490 U.S. at 397; Thompson, 1999 WL 301693, at *6.  To the contrary, the Eighth and Fourteenth Amendment standards require that the officer acted with the necessary level of culpability regarding the unconstitutional condition.  See Sims v. Artuz, 230 F.3d 14, 20–21 (2d Cir. 2000) (articulating the requirement of an objective and subjective component under the Eighth Amendment and defining the subjective component as "shown by actions characterized by 'wantonnes'"); Darnell v. Pineiro, 849 F.3d 17, 32 (2d Cir. 2017) (defining the second prong of a Fourteenth Amendment claim as requiring "'deliberate indifference' to any objectively serious condition of confinement"[33]).

---

[33] The Darnell court notes that the Supreme Court in Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015), defined deliberate indifference objectively in the Fourteenth Amendment context.  See Darnell, 849 F.3d at 34–35.  Kingsley overruled prior Second Circuit precedent that treated the Eighth and Fourteenth Amendment standards the same for the purposes of deliberate indifference to unconstitutional

Additionally, the objective component under the Eighth and Fourteenth Amendments enunciate a stricter standard than the Fourth Amendment.  See Darnell, 849 F.3d at 30 (noting that the objective prong of both the Eighth and Fourteenth Amendments require "an unreasonable risk of serious damage to [the plaintiff's] health"); Sims, 230 F.3d at 21 ("To prevail on a claim based on the conditions of his confinement, a prisoner must show 'extreme deprivations,' '[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society.'" (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992))).  Therefore, the precedents finding no constitutional violation under the Eighth and Fourteenth Amendments are not dispositive of Shakir's claim evaluated under the Fourth Amendment.

In this case, construing the facts in the light most favorable to Shakir, a reasonable jury could conclude that Stankye's conduct toward Shakir created conditions of confinement that were objectively unreasonable.[34]  As noted previously, the Fourth

---

conditions of confinement.  See id.  Some of the cases addressing stripping and cold temperatures under the Fourteenth Amendment were decided under the prior rule treating Eighth and Fourteenth Amendment claims the same.  See Silber, 2011 WL 1225594, at *9.  However, even with the Supreme Court's change to the Fourteenth Amendment standard, it nonetheless remains distinct from a Fourth Amendment inquiry because the Fourteenth Amendment continues to require deliberate indifference, albeit defined differently.  See Darnell, 849 F.3d at 35 (requiring under the Fourteenth Amendment that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant official knew, or should have known, that the condition posed an excessive risk to health or safety" (emphasis added)).

[34] Stankye does not address Shakir's claim of unconstitutional conditions of confinement in his argument for qualified immunity.  See Stankye Mem. in Supp. at 27–28; infra note 6.  However, assuming Stankye did extend his qualified immunity argument to this claim, the court notes that summary judgment on a ground of qualified immunity would nonetheless be inappropriate for the same reasons as stated above under the court's analysis of Shakir's Fourth Amendment unreasonable search claim.  See Maye v. Vargas, 638 F. Supp. 2d 256, 262 (D. Conn. 2009) ("Although qualified immunity is a question of law, because issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted.").  Because a genuine dispute exists as to the issue of reasonableness, the court is not prepared to conclude that no reasonable jury could find that the conditions of confinement he experienced were objectively unreasonable.  See Obert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003).

Amendment requires balancing the "nature and quality of the intrusion" with the "countervailing governmental interests at stake." See Graham, 490 U.S. at 396. Although countervailing government interests in maintaining security may require a strip search for weapons or contraband under certain conditions, a jury could reasonably conclude that, even if the strip search was objectively reasonable, the security interest does not extend after the search has been completed and no weapons have been found. Therefore, a jury could find that it was objectively unreasonable to continue to deprive an arrestee of his clothing in a cold cell during the New England winter. Notably, Stankye does not identify a countervailing interest justifying his conduct because he asserts that he did not have any contact with Shakir at the police station at all on the day in question. See Stankye Aff. at ¶¶ 28–29. Such issues of fact are appropriately determined by the jury, not by the court on summary judgment.

Therefore, considering Shakir's claim under the Fourth Amendment, the court concludes that Stankye has not carried his burden of establishing the absence of a genuine issue of material fact as to whether his conduct created unconstitutional conditions of confinement. His Motion for Summary Judgment is denied on this claim.

G.      Declaratory Relief (Stankye)

In addition to monetary damages, Shakir seeks a declaratory judgment that the defendants engaged in unconstitutional conduct in connection with Shakir's arrest and A.S.'s seizure on February 6, 2009. See Am. Compl. at 21 ¶ 80. The court has already dismissed the request for declaratory relief against Marotta and Fratta. See Ruling on Marotta and Fratta's Mot. to Dismiss (Doc. No. 177) at 14-16. Stankye now argues that he should be awarded summary judgment on the remaining request for a declaration

against him in his official capacity because such relief is barred by the Eleventh Amendment.  See Stankye Mem. in Supp. at 28–29.

The Eleventh Amendment prohibits suit against a state as a defendant in federal court, absent consent of the state or abrogation by Congress.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984).  This immunity extends not only to states themselves, but also to state agencies or state officers in their official capacity.  See id.  In Ex Parte Young, 209 U.S. 123 (1908), the Supreme Court held that an exception to the Eleventh Amendment's grant of sovereign immunity from suit permits a plaintiff to sue a state official acting in his or her official capacity for prospective injunctive relief for continuing violations of federal law.  Id. at 155–59.  The exception to Eleventh Amendment immunity, however, does not apply to claims against state officials seeking declaratory or injunctive relief for prior violations of federal law.  See Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993) (stating that the Ex Parte Young "applies only to prospective relief [and] does not permit judgments against state officers declaring that they violated federal law in the past"); Green v. Mansour, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of Young . . . to claims for retrospective relief."); Ward v. Thomas, 207 F.3d 114, 120 (2d Cir. 2000) ("'[A] declaratory judgment is not available when the result would be a partial end run around' the Eleventh Amendment's bar on retrospective awards of monetary relief." (quoting Green, 474 U.S. at 73)).

Shakir's request for a declaration that Stankye violated his Fourth, Eighth, and Fourteenth Amendment rights in 2009, cannot be properly characterized as "prospective" because Shakir does not indicate how such relief would remedy a

continuing constitutional violation or prevent the threat of a future violation.  All of the

conduct relevant to the violations occurred on February 6, 2009, during the search and

arrest at his residence or shortly thereafter at the DPD.  Thus, Shakir's request for

declaratory relief does not satisfy the exception to the Eleventh Amendment immunity

set forth in Ex Parte Young.  Absent any request for prospective relief to remedy

ongoing violations of federal law, a declaration that Stankye violated Shakir's federal

constitutional rights in the past is barred by the Eleventh Amendment.  See Green, 474

U.S. at 73 (holding that the Eleventh Amendment prevents federal courts from providing

a declaratory judgment that state officials violated federal law in the past if there is "no

claimed continuing violation of federal law" or "any threat of state officials violating the . .

. law in the future").

Moreover, in addition to the Eleventh Amendment bar to his claim for declaratory

relief, Shakir lacks Article III standing to pursue a declaratory judgment against Stankye.

Though this issue was not briefed by Stankye, federal courts have an "independent

obligation to assure that standing exists."  See Summers v. Earth Island Inst., 555 U.S.

488, 499 (2009).  It is well established that a plaintiff must have constitutional standing

for each form of relief he seeks.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332,

351–52 (2006).  The "irreducible constitutional minimum" of Article III standing is: "(1) an

injury in fact, (2) a sufficient causal connection between the injury and the conduct

complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable

decision."  See Montesa v. Schwartz, 836 F.3d 176, 195 (2d Cir. 2016) (quoting Susan

B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014)).

Here, where Shakir seeks a declaratory judgment, he "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future." <u>Dashawn E. by Charlotte E. v. Safir</u>, 156 F.3d 340, 344 (2d Cir. 1998) (citing <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105–06 (1983)). For the reasons noted above, Shakir's claims are grounded in alleged past violations occurring on or shortly after February 6, 2009. <u>See</u> Am. Compl. at 21 ¶ 80. He has not suggested that he is likely to suffer a future injury, as his allegations of improper conduct are entirely phrased in the past tense. <u>See generally</u> Am. Compl. Additionally, Shakir's claim also fails to meet the third requirement of standing because a declaratory judgment could not redress the past harms he alleges in his Amended Complaint. <u>See</u> <u>Stevens v. Malloy</u>, No. 3:15-CV-934 (JCH), 2016 WL 6440112, at *6 (D. Conn. Oct. 28, 2016) ("Just as [the plaintiff's] request for declaratory relief fails as to the injury prong of the standing inquiry, so too does it fall short on redressability grounds. Declaratory relief, prospective in nature, could not possibly redress a past constitutional violation; rather, . . . money damages are the proper remedy for past violations of [plaintiff's] rights."). Therefore, he can satisfy neither the injury-in-fact nor the redressability requirements for standing.

Shakir argues that declaratory relief is appropriate because the alleged violations of his rights contributed to his conviction and sentence, which he is currently serving. <u>See</u> Mem. in Opp. to Stankye at 53. However, "the question is not whether [the plaintiff] still feels the effects of a past constitutional violation, but rather whether he is likely to suffer a similar injury—a similar violation of his constitutional rights—in the future." <u>See</u> <u>Stevens</u>, 2016 WL 6440112, at *5; <u>see also</u> <u>Jemsek v. Rhyne</u>, 662 Fed. App'x 206, 211 (4th Cir. 2016) ("[E]ven though the consequences of any past violation may persist,

invoking those effects does not transform past state action into an ongoing violation. Rather, it is an attempt to avoid the obvious fact that the actual violation alleged is a past event that is not itself continuing." (internal quotation marks omitted)); Int'l Coal. for Religious Freedom v. State of Maryland, 3 Fed. App'x 46, 51 (4th Cir. 2001). In Stevens, the court held that the plaintiff was not entitled to declaratory relief based on the future loss of relationship with his child caused by a past violation of his constitutional rights, "absent some renewed violation." Stevens, 2016 WL 6440112, at *5. Likewise, Shakir's current incarceration does not transform otherwise retrospective relief into prospective relief. Otherwise, any incarcerated individual would have recourse through the Declaratory Judgment Act to circumvent the Eleventh Amendment in challenging the conduct of state officials related to his conviction.

In sum, in the absence of any material facts in dispute regarding the request for declaratory relief, Stankye is entitled to summary judgment on this request as a matter of law both because Shakir's request for declaratory judgment is barred by the Eleventh Amendment and because he lacks standing to bring the claim. Stankye's Motion for Summary Judgment is granted as to Shakir's request for a declaration that Stankye violated his constitutional rights.

## VI. CONCLUSION

For the foregoing reasons, Fratta and Marotta's Motion for Summary Judgment is **GRANTED**. Stankye's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. Specifically, it is granted with respect to Shakir's federal conspiracy claim, his Fourteenth Amendment procedural and substantive due process claims, his Fourth Amendment unlawful seizure claim, his Eighth Amendment claim, and his claim for declaratory relief. It is denied with respect to his Fourth Amendment unlawful search

claim and his claim for unconstitutional conditions of confinement, which the court interprets liberally as raised under the Fourth Amendment.

**SO ORDERED.**

Dated at New Haven, Connecticut this 5th day of January, 2018.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge